■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HENRY THOMPSON, Also Known as HENRY DWIGHT THOMPSON, Appellant.—Motion granted to extent of recalling and vacating this court's order (158 AD2d 261) and accompanying memorandum decision, and substituting a new order and memorandum decision, which follows:

Judgment, Supreme Court, New York County (Martin Rettinger, J.), rendered April 26, 1988, upon indictment No. 8213/87, convicting defendant, after a jury trial, of assault in the second degree (Penal Law § 120.05 [2]) and sentencing him to an indeterminate term of imprisonment of from 1½ to 4½ years, is reversed, on the law, and as a matter of discretion in the interest of justice, and the case remanded for a new trial; and the judgment, Supreme Court, New York County (Martin Rettinger, J.), rendered April 26, 1988, upon indictment No. 11708/87, convicting defendant, upon a plea of guilty, of attempted robbery in the third degree (Penal Law §§ 110.00, 160.05) and sentencing him to an indeterminate term of imprisonment of 1½ to 4½ years, to run concurrently with the sentence imposed upon the first indictment, is vacated, and the matter remanded for further proceedings.

The essential facts are as follows:

At approximately 1:00 A.M. on September 3, 1987, defendant encountered the complainant, Lisa Cullen, on St. Mark's Place in Manhattan. Cullen, who was an acquaintance of defendant, angrily confronted him about $5 which she and a friend had given him to procure "pot" for them a month earlier. Cullen accused defendant of having neither returned with the marihuana nor refunded the money. Defendant denied the accusation, claiming that he had in fact returned, but had been unable to find Cullen.

Immediately prior to being stopped on the street by Cullen, defendant had been riding a bicycle with his dog, a pit bullterrier, leashed at his side. As the disagreement escalated, Cullen became so enraged that she picked up defendant's bicycle, which he had dismounted and left at the curb, and threw it into the street.

There was conflicting evidence as to the exact point in the dispute when the dog, agitated by the commotion and shouting, lunged at Cullen and began to bite her foot. The assault charge brought against defendant was predicated on the the-

ory that he had deliberately loosened the leash to enable the dog to reach Cullen. Both Cullen and a second prosecution witness, Angela Wendt, testified to that effect, but their versions of the incident conflicted, with Wendt stating that Cullen had thrown the bicycle after an initial attack by the dog, which precipitated defendant's releasing the dog to lunge a second time. Cullen, on the other hand, had testified to solely one attack, which came after she had thrown the bicycle.

Testifying in his own behalf, defendant denied any intentional action, claiming, instead, that the dog had seized Cullen's foot when defendant moved to retrieve his bicycle as Cullen was coming back to the sidewalk after throwing it.

While this case presents little more than a credibility contest centering on whether defendant intentionally permitted the dog to attack Cullen, an examination of the record persuades us that the prosecutor's summation was so highly inflammatory and interspersed with improper commentary and invective as to have unduly prejudiced defendant and denied him a fair trial. (See, People v Ashwal, 39 NY2d 105.)

After a pro forma greeting, the prosecutor began his summation as follows: "On the morning of September 3rd, 1987 the defendant * * * Henry Thompson committed an act so outrageous, so cowardly, so contemptible as to shock the sensibilities of any reasonable person following the standards of conduct being acceptable in the twenty-first century [sic]. [In] retaliation for an attack upon a piece of metal shaped in the form of a bicycle, this defendant sent a dog, an animal bred over centuries to be a fighting machine, hurling at a defenseless 120 pound woman. This animal, this pit bull terrier, carrying out the desires of its owner, used its sharp teeth, its vise-like jaw, its imperviousness to pain to sink its teeth into heavy combat boots and to imbed its teeth into the flesh of Lisa Cullen. That [the] dog which drilled its way into Lisa Cullen's leg was a dangerous instrument is beyond question."

The prosecutor's closing statement progressed in this manner as he, describing the attack and doubling the duration of time estimated by the witnesses, intoned:

"The dog began to chew at her leg, chewing, chewing * * * the defendant standing, watching * * * from half a minute to a minute. * * * The defendant watched as the dog gnawed, chewed, working its way through heavy combat boots * * * imbed its teeth in her flesh. * * *

"A minute [to] watch a dog chew at someone's leg is a very long time. Just imagine a stop watch, a minute. A dog begins to chew the woman's leg. It goes on. The defendant watches. The dog chews. The defendant watches. Chews, chews. The defendant watches. It goes on. Lisa Cullen screams, crawls."

The inflammatory rhetoric escalated as the summation continued, with the prosecutor ultimately resorting to gruesome analogies: "If he had taken something of hers and thrown it to the ground and damaged it, he wouldn't be here. You are here because he did something absolutely outrageous, because he took a dog that he knew was capable of gnawing that woman's leg off and set it on her in response to what she did. That was absolutely unreasonable, absolutely inappropriate. It was no different than if he pulled out a gun and shot her in the leg. No different if he got a club and beat her or got an ax and started hacking at her leg. It was outrageous and inappropriate. And, finally, it was criminal."

Nor were the prosecutorial improprieties limited to dramatic expressions of pain and brutality. The closing statement also mischaracterized the defense by accusing defense counsel of claiming, "in an oblique way", that defendant was "justified" in "set[ting] a pit bull terrier on a woman". When defense counsel objected to this comment, as he had on several occasions throughout the prosecutor's summation, an apparently incredulous court responded, "You're saying that's the defendant's position?" Although the defense objection was sustained and a curative instruction was given, the prosecutor persisted in this vein, telling the jury that, "It's not oblique, ladies and gentlemen, the suggestion to you that somehow Lisa Cullen got what she deserved" and adding that this was "the only issue in the case, the only question that you have when you go into that jury room".

In the face of this record, we are compelled to reiterate that

"summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits. * * *

"Above all [counsel] should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant" (People v Ashwal, supra, at 109-110).

The repeated "appeal[s] to passion and sentiment" and the other "myriad of improper comments" which comprised the prosecutor's summation in the matter before us served to

deprive defendant of a fair trial. *(People v Hansen,* 141 AD2d 417, 419, 420; *see, People v Dunlap,* 138 AD2d 393; *People v Rudd,* 125 AD2d 422, 425-426.)

Accordingly, the judgment rendered upon indictment No. 8213/87 is reversed and a new trial is directed. The judgment rendered upon indictment No. 11708/87 is reversed, on consent, as having been induced by the promise of concurrent sentencing. *(See, People v Fuggazzatto,* 62 NY2d 862, 863.) We have considered the balance of defendant's arguments on appeal, and find them to be without merit. Concur—Ross, J. P., Milonas and Kassal, JJ.

Asch and Smith, JJ., dissent in a memorandum by Asch, J., as follows: I would affirm the judgment of conviction.

Rather than being "highly inflammatory" and replete with "improper commentary and invective", as the majority characterizes it (at 237), the prosecutor's summation simply reiterated, for the most part, the evidence given by the witnesses. Further, the remarks made were in response to defendant's closing argument and, when viewed in context, were proper comment on the evidence. I find it highly significant that defense counsel, who represented defendant in a capable and aggressive manner during this trial, objected no more than three times during the prosecutor's 33-page summation. Only two of these objections can be characterized as relating to "inflammatory" remarks, and of these two, one was overruled and the other was sustained and curative instructions given.

The beginning of the summation was well within the bounds of rhetorical propriety and, in effect, simply related what the prosecutor planned to deal with at length in the body of his closing. Defense counsel did not object to it at trial. Thus, after the prosecutor noted the crime was "outrageous", "cowardly" and "contemptible", and set forth the bare-boned facts, the majority writing finished that short excerpt from the summation with the sentence: "That [the] dog which drilled its way into Lisa Cullen's leg was a dangerous instrument is beyond question." However, the very next sentences of the summation (not included by the majority) continue:

"That the injuries inflicted upon her were so severe they constitute physical injury is beyond dispute. Equally beyond question, equally beyond dispute is that the defendant intentionally set that dog upon Lisa Cullen. Why is this beyond question, why is it beyond dispute? Because it is the only conclusion that can be reasonably drawn from the sole credible evidence that you heard during this case, the testimony of the People's witnesses.

"This has been a short case and I'm sure you all pretty much recall what was testified to in the last couple of days but it is incumbent at this stage for me to really discuss the testimony with you a little bid before we really get into what I see as the sole issues in this case."

Counsel then reviewed the testimony of Lisa Cullen and Angela Wendt spread out over four pages before he "intoned" the next passage to which the majority objects. The full, unexpurgated excerpt (unobjected to at trial) reads as follows: "Both witnesses told you what happened then. Lisa began to run, was knocked to the ground by the dog. The dog began to chew at her leg, chewing, chewing. Miss Wendt told you how she saw the defendant standing, watching this. The witnesses told you this occurred from anything from half a minute to a minute. The defendant watched as the dog gnawed, chewed, working its way through heavy combat boots, combat boots which we have photographs of in evidence. You can see from the photographs that were taken shortly after the incident. Likewise, the bite marks clearly toward the back of the combat boots. Lisa told you how the dog managed to eat its way through these and imbed its teeth into her flesh."

Obviously, in full, the passage has none of the hypnotic, intonation effect the majority conveys in its truncated version. Further, the prosecutor related the "chewing" to photographs in evidence and the testimony.

After another 11 pages of summarizing the testimony, the prosecutor, in the next excerpt about which the majority complains (but again, to which defendant at trial did not object), said in the full context: "Both of the witnesses testified that this occurred from anywhere from half a minute to a minute. Some of you may be thinking well, that's not really that long a time, maybe he was shocked, maybe he was surprised, maybe he couldn't pull his dog away. A minute, watching a dog chew at someone's leg is a very long time. Just imagine a stop watch, a minute. A dog begins to chew the woman's leg, it goes on, the defendant watches, the dog chews, the defendant watches, chews, chews, the defendant watches, it goes on. Lisa Cullen screams, crawls, the people on the street corner come, they tell the defendant get your dog off of the lady, get your dog off of her. He continues to watch, continues to watch. The dog continues to chew. Nothing happens. It goes on and on, with people telling the defendant to get the dog off of Lisa Cullen. Finally, taking his own good time, he leans over, pulls the dog off of her, unleashing her. Still not a minute. Clearly, this defendant intended that that

dog should bite Lisa Cullen." Far from being inflammatory, this passage simply sought to demonstrate defendant's criminal intent, as the last sentence of this excerpt clearly indicates.

The next paragraph the majority cites (at 238) as escalating "[t]he inflammatory rhetoric" occurs over 12 pages later. Although the majority characterizes it as "resorting to gruesome analogies" (at 238), the prosecutor did no more than to impress upon the jury that using a vicious pit bull dog as a weapon was no different from using a gun or club, and that it was a dog in this case which constituted the "dangerous instrument" made no difference. Once more, defense counsel at the trial did not find this analogy objectionable.

Finally, while defendant and the majority (at 238) accuse the prosecutor of "mischaracteriz[ing] the defense by accusing defense counsel of claiming, 'in an oblique way', that defendant was 'justified' in 'set[ting] a pit bull terrier on a woman' ", defense counsel objected only to what he felt was a mischaracterization of his defense as "justification", expressly noting, at the sidebar, to the court, "[h]e's used the word justified". In response, the court sustained the objection and gave the jury a curative instruction "that it's not the position of the defendant that there was justification to set the dog upon anybody. *It's their position that the dog was never set upon Miss Cullen in this case.*" (Emphasis added.) Contrary to the impression given by the majority (at 238), the prosecutor did not "persist in this vein". Rather, reading in the full context, he continued: "You've heard a lot of talk during the defense summation about Lisa Cullen's hair color, you heard allusions that she is someone who likes to play with danger. Interesting, what's all of this about Lisa Cullen's hair color? You remember during the voir dire of defense counsel, he made a big deal you are not supposed to judge this defendant based on the way he looks. Then we hear on summation about Lisa Cullen's hair, about her lifestyle. Isn't it interesting. We are not supposed to look at the defendant and make any judgments about him as a person based on his experience. Because on September, 3, 1987 Lisa Cullen may have dressed in a way somewhat bizarre, may have left school at the age of seventeen, may like to go out on the streets and drink beer with her friends, somehow that's become an issue in this case. It's not oblique, ladies and gentlemen, the suggestion to you that somehow Lisa Cullen got what she deserved. That, ladies and gentlemen, as I see it, is the only issue in this case, the only question that you can have when you go into that jury

room. Well, there is an obvious answer to the question. No, she did not and there is a clear answer, you cannot use a dangerous instrument like a dog in this case to punish someone because they threw your bike to the ground."

Once again, while the majority objects (at 238) to the characterization of the defense as being " 'that [the victim] got what she deserved' ", the defense counsel did not object at trial to this statement, and the reason is obvious. As can be gleaned from the above excerpt, the defense counsel, on his summation, attacked Lisa Cullen as an immature woman who had somehow instigated the dog into attacking her. He even compared her to the character in the movie "Desperately Seeking Susan", played by the singer and movie star, Madonna, "who likes to do risque things, run around the East Village, hang out half the night, drunk *[sic]* beer in Tompkins Square Park with the guys, the group, smokes pot and get up and still go to work the next day". In describing what had occurred, defense counsel said: "Well, why did Lisa go off and act out in the way she did? It may have, as I saod *[sic]*, had to do with the drinking and it may have had something to do with her character also or the type of person she is, she had just not matured very much. * * * And I think we all have to take notice of the fact that Lisa Cullen's actions on that night were not very reasonable. I mean a man is standing with a Pit Bull, whether it be on a leash or not, you don't start attacking him, yelling, screaming, taking his property, his bicycle, throwing it in the street."

With just these short excerpts, it is readily apparent there was no mischaracterization of the defense in claiming that its tactic was to blame the victim for what happened to her. The prosecutor was simply responding to these defense arguments, and all the unobjected-to remarks were based on the evidence. The comments were within the broad, permissible bounds of summation rhetoric *(see, People v Galloway,* 54 NY2d 396).