945 P.2d 317

STANDARD CHARTERED PLC, a United Kingdom Corporation, Standard Chartered Bank, a United Kingdom Banking Entity, and Standard Chartered Overseas Holdings Ltd., a United Kingdom Corporation, Plaintiffs–Appellees,

v.

PRICE WATERHOUSE, a General Partnership, Defendant–Appellant.

STANDARD CHARTERED PLC, a United Kingdom Corporation, Standard Chartered Bank, a United Kingdom Banking Entity, and Standard Chartered Overseas Holdings Ltd., a United Kingdom Corporation, Plaintiffs–Appellants, Cross Appellees,

v.

PRICE WATERHOUSE, a General Partnership, Defendant–Appellee, Cross Appellant.

Nos. 1 CA–CV 93–0461, 1 CA–CV 93–0442.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 7, 1996.

As Corrected on Denial of Reconsideration Jan. 13, 1997.

Review Denied Oct. 21, 1997.*

* Jones, V.C.J., recused himself and did not participate in the determination of this matter.

Beus, Gilbert & Morrill, P.L.L.C. by Leo R. Beus, L. Richard Williams, Mark C. Dangerfield, Martin A. Aronson and Michael R. Devitt, and Gust Rosenfeld by Richard A. Segal, Phoenix, for Plaintiffs–Appellees.

Snell & Wilmer by Daniel J. McAuliffe and Robert B. Hoffman, Phoenix, Cravath, Swaine & Moore by Thomas D. Barr, Rory O. Millson and Francis P. Barron, New York City, Brown & Bain, P.A. by Paul F. Eckstein, H. Michael Clyde and Joel W. Nomkin, Phoenix, and Price Waterhouse by Eldon Olson, General Counsel, Rodman W. Benedict, Associate Counsel, New York City, for Defendant–Appellant Price Waterhouse.

Gammage & Burnham by Grady Gammage, Jr., Phoenix, for Amici Curiae Society of Certified Public Accountants and American Institute of Certified Public Accountants.

Willkie Farr & Gallagher by Louis A. Craco, David P. Murray and Randy J. Branitsky, and American Institute of Certified Public Accountants by Richard I. Miller, General Counsel, New York City, for Amicus Curiae American Institute of Certified Public Accountants.

## OPINION

FIDEL, GARBARINO and WEISBERG, Judges.

The plaintiffs are Standard Chartered PLC, a British banking corporation, and two of its subsidiaries, Standard Chartered Bank and Standard Chartered Overseas Holdings, Ltd. (collectively "SC"). The defendant is Price Waterhouse, an accounting firm ("PW"). SC brought this action as assignee or successor in interest to certain tort and statutory damages claims owned originally by Union Bancorp of California ("Union") and United Bank of Arizona ("United"). The gravamen of the action is that Union was caused to buy United, a bank that it would not otherwise have bought, by PW's negligent audit of United and approval of misleadingly favorable financial statements that United had prepared. After a lengthy trial by jury, the jury rendered multiple plaintiffs' verdicts of $338,053,778; and the trial court granted PW a new trial on two of many asserted grounds. SC appeals from the grant of a new trial. PW appeals from the trial court's refusal to grant it judgment notwithstanding the verdict ("JNOV"), and asserts by cross-appeal several additional grounds to support the grant of a new trial.

In the course of our opinion, we consider the following issues:

1. Is a negligence claim against an auditor assignable? *Yes.*

2. Did PW "participate in or induce" Union's purchase of United so as to subject PW to liability under the Arizona Securities Act? *No.*

3. In serving as United's independent auditor and in certifying United's financial soundness to Union, did PW act as a fiduciary to either United or Union? *No.*

4. Does a party irretrievably waive a ground for JNOV by neglecting to include that ground within a motion for directed verdict at the close of the evidence? Or may the motion be considered nonetheless

if the issue (a) is purely legal, (b) was aired in prior motions so that the adverse party cannot reasonably claim surprise, and (c) is not one to which the adverse party, had there been a motion for directed verdict, might have responded by seeking leave to reopen to present further evidence? *The latter.*

5. Is there a claim for "auditor negligence" separate and distinct from a claim for negligent misrepresentation? *No.*

6. Does Arizona law measure the range of liability for negligent misrepresentation by the ordinary negligence yardstick of reasonable foreseeability, or does it employ the more circumscribed range of liability set forth in section 552 of the Restatement (Second) of Torts? *The latter.*

7. Must a plaintiff in a negligent misrepresentation claim prove loss causation and out-of-pocket damages? *Yes.*

8. When the negligence that a third party attributes to an auditor is the failure to detect and report the financial mismanagement and inaccurate reporting of the auditing client, may the auditor attempt to reduce its share of liability by allocating fault to the negligent client? *Yes.*

9. Does apportionment of fault in Arizona Revised Statutes Annotated ("A.R.S.") § 12–2506 apply to economic damage claims? *Yes.*

After addressing these and other issues, we conclude that this case must be retried, but on SC/Union's negligent misrepresentation claim alone. On all other claims that SC brought on behalf of Union, and on all claims that SC brought on behalf of United, we conclude that PW is entitled to JNOV.

## I. FACTUAL AND PROCEDURAL HISTORY

SC is a United Kingdom banking corporation with subsidiaries worldwide and more than $35 billion in assets. In the mid–1980s, SC decided to expand its bank holdings in the United States. Through Union, a wholly-owned subsidiary, SC sought to acquire United, then the fourth largest bank in Arizona.

PW had functioned as United's independent auditor since 1970. As an auditor, PW annually examined United's books and records to investigate and verify the accuracy of its financial statements. United's financial statements, including balance sheets and income statements, were a primary source of information, both for United itself and for others outside the company, concerning the actual condition of United's operations, assets, and liabilities.

PW audited United for fiscal years 1985 and 1986 for an annual fee of approximately $140,000, and each year issued unqualified opinions supporting the accuracy, completeness, and regularity of United's financial statements. An auditor's "unqualified" opinion on a company's financial statements is an opinion without reservations or qualifications and amounts to a representation that the contents are reasonably accurate with no material exceptions.

In September 1985, Union and United entered into a merger agreement by which Union would purchase all of United's capital stock. PW was not a party to the agreement. The agreement did not require an audit or certification of United as a condition of closing, and neither took place. The agreement did require, however, that Union be given all United financial statements audited by PW, other United financial information reviewed by PW, and "management letters" prepared by PW describing any weaknesses that it found in United's internal controls. Within the agreement, United also consented for Union to receive from PW any information about United that Union might request. The agreement conditioned Union's obligation to perform on the absence of a material adverse change in United's financial condition and on receipt of certification that United's shareholders' equity was at least $135 million as of the merger's effective date.

United's "loan portfolio" consisted of the aggregated short-term and long-term debts that United's loan customers owed the bank. The loan portfolio was a significant component of United's assets, comprising $1.4 billion of United's total assets of $2.1 billion in 1985. As United's independent auditor, one

of PW's functions was to periodically evaluate the loan portfolio, the individual customer accounts that comprised the loan portfolio, and United's internal lending controls in order to predict what proportion of the loans would ultimately be repaid. This evaluation in turn tested the accuracy of United's allowance for uncollectible loans, which United showed on its financial statements as a charge against income.

In November of 1985, PW representatives met with Union's chief financial officer, Jack Frazee, and others to solicit the retention of PW as United's auditor. One subject they addressed was the public financings that Union would undertake to raise money to fund the purchase of United. Frazee later met individually with PW's lead audit partner, Karl Almquist, to discuss PW's working relationships with United's managers and directors. Before the holidays in 1985, Frazee decided to rely on PW for ongoing financial information about United through the closing, and he communicated that decision to PW, to representatives of United, and to PW's competitor, Peat Marwick.

In early 1986, PW issued an unqualified audit opinion on United's 1985 financial statements. PW stated that it had conducted its audit in accordance with generally accepted auditing standards and that the information in the financial statements was fairly presented in accordance with generally accepted accounting principles. Based on the audited financial statements, Union bought United stock in the open market and proceeded toward closing.

An expert witness for SC testified at trial, however, that United's 1985 income statement had actually overstated income by approximately $27 million. The same expert testified that PW had not followed generally accepted auditing standards in preparing its audit opinion. Frazee further testified that, if Union had known of the undisclosed dwindling of United's shareholders' equity, Union would not have gone forward with the transaction.

In 1986, Union raised $300 million to help fund its acquisition of United by selling its own securities in three public offerings. PW helped Union prepare the financial information for these offerings. PW formally consented to the inclusion of its audit report on United's 1985 financial statements in Union's SEC filings for the securities issues. PW also wrote comfort letters to United's board of directors and Union's securities underwriters, stating that United's financial statements formally complied with federal accounting requirements.

Immediately before the Union–United acquisition closed on January 8, 1987, United provided Union a draft consolidated balance sheet showing that, as of December 31, 1986, its shareholders' equity was $147 million. This was well above the $135 million minimum required by the 1985 merger agreement. Through an intermediary at United, Union asked PW whether it would propose any adjustments to the consolidated balance sheet. Almquist was aware that Union sought the information in connection with the closing. He told the United intermediary that "our audit was not finished and we had a lot of work left to do before we could complete our audit as of December 31, 1986, but went on to explain that, as of that point in time, we knew of no adjustments that we would be proposing." Almquist cautioned that PW's audit work for 1986 was in a preliminary phase.

Union proceeded with the closing. At trial, SC presented expert testimony that if PW had followed generally accepted auditing standards in the 1985 and 1986 United audits, it would have discovered and disclosed before January 8, 1987, that United's financial statements were materially misstated and that its system of internal controls was materially unsound. As examples, SC presented evidence of problem loans to the Victorio Company, Larry Malanfant, and the Newbery Corporation, for which United should have reported predicted losses of approximately $34 million for 1985 and 1986. PW neither discovered nor disclosed these problem loans and the weaknesses in internal controls that had permitted such problems to develop.

In January 1988, one year after it acquired United for $334,239,225, SC/Union sold United to Citibank for $207.1 million, retaining

certain United subsidiaries and loans receivable that Citibank did not want. On October 31, 1988, California First Bank acquired the stock of the SC subsidiary that owned Union. SC agreed to retain the impaired assets that Citibank had rejected, as well as any legal claims that Union could assert as a consequence of the purchase of United.

SC commenced this action against PW on December 30, 1988. SC undertook to prove that PW had carelessly carried out the audit of United, failed to investigate the solidity of United's loan portfolio and internal loan controls, and erroneously approved financial statements that significantly exaggerated the value of United's assets. SC asserted—exclusively as Union's and United's assignee—damages claims for auditor negligence, negligent misrepresentation, breach of fiduciary duty, racketeering, and violation of the Arizona Securities Act, A.R.S. § 44-1991 (1994).[1] SC claimed a net loss of $338,053,768, which it presented as the difference between its gross investment in United, including borrowing costs and the cost of supporting the assets after the sale to Citibank, and its receipts, including dividends on the United stock and the proceeds from sale to Citibank.

After a trial of eleven and one-half months, the jury found in favor of PW on SC/Union's racketeering count, and in favor of SC in the amount of $3,872,909 on SC/Union's Arizona Securities Act claim. On SC/United's tort claims of auditor negligence, breach of fiduciary duty, and negligent misrepresentation, the jury found in favor of SC in the amount of $338,053,778. On SC/Union's separately submitted tort claims of auditor negligence, breach of fiduciary duty, and negligent misrepresentation, the jury also found in favor of SC in the amount of $338,053,778, but assigned fault 85% to PW and 15% to Union.

PW moved for JNOV or, alternatively, for a new trial on the tort and Securities Act claims. The trial court declined to grant JNOV, but granted a new trial, determining that the jury's awards of different sums on Union's tort and Arizona Securities Act claims were "irreconcilably inconsistent," and

that its identical damages awards to SC on Union's and United's claims were likewise "irreconcilable" or "hopelessly confused." The court granted the new trial on both liability and damages, explaining that "the issue of liability is inextricably interwoven with damages."

Formal judgment was entered in accordance with the trial court's rulings. PW's notice of appeal from the denial of its motion for JNOV generated our cause number 1 CA–CV 93–0461. SC's independent appeal from the grant of a new trial, and PW's corresponding cross-appeal, generated our cause number 1 CA–CV 93–0442. The two appeals have been consolidated as 1 CA–CV 93–0461. We have jurisdiction pursuant to A.R.S. § 12–2101(E) and (F)(1).

## II. ASSIGNABILITY AND STANDING

PW contends that Arizona law prohibits the assignment of all claims "sounding in tort" or those that are "personal" in nature. PW compares the accountant-client relationship to the attorneyclient relationship and urges that Arizona's anti-assignment rule applies with special force to those "personal" claims that arise from a professional's services for a client. PW asserts that Union and United's assignment of their tort claims to SC is invalid, and bestows no standing on SC to bring this action.

PW relies heavily on a statement in a worker's compensation case, *K.W. Dart Truck Co. v. Noble*, 116 Ariz. 9, 11, 567 P.2d 325, 327 (1977), that "[g]enerally an unliquidated claim for damages arising out of a tort is not assignable." PW also relies on *Sabon Investments, Inc. v. Braniff Airways, Inc.*, 534 F.Supp. 683, 685 (D.Ariz.1982), in which a travel agency's federal tort action based on claims assigned to it by its clients was dismissed under the purported Arizona rule that "a cause of action in tort is not assignable absent a specific statute." However, upon close examination of the cases, we find the "Arizona anti-assignment rule" considerably narrower than PW suggests.

---

1. Other claims by SC and counterclaims by PW were disposed of by directed verdict and are not at issue on appeal.

Early Arizona cases established survivability of a cause of action as the test of its assignability. *Employers Casualty Co. v. Moore*, 60 Ariz. 544, 142 P.2d 414 (1943); *United Verde Extension Mining Co. v. Ralston*, 37 Ariz. 554, 296 P. 262 (1931); *Deatsch v. Fairfield*, 27 Ariz. 387, 233 P. 887 (1925); accord *Shepard v. Cal–Nine Farms*, 252 F.2d 884 (9th Cir.1958), *cert. denied*, 356 U.S. 951, 78 S.Ct. 916, 2 L.Ed.2d 844 (1958). In *Employers Casualty*, the court explained the rule against assignment of personal injury claims as an application of the survivability standard; personal injury claims were not assignable because they were "strictly personal" and could not survive the death of the injured party. 60 Ariz. at 548, 142 P.2d at 415. A survivable claim, however, was an assignable claim, upon which the assignee could sue in his own name. *United Verde*, 37 Ariz. at 559, 296 P. at 264.

In later cases, the Arizona courts detached the rule of non-assignability of personal injury claims from the survivability standard and supported it on independent policy grounds. In *Harleysville Mutual Insurance Co. v. Lea*, 2 Ariz.App. 538, 541, 410 P.2d 495, 498 (1966), we explained that the non-assignability rule prevents "unscrupulous people" from "traffic[king] in law suits for pain and suffering." In *State Farm Fire & Casualty Co. v. Knapp*, 107 Ariz. 184, 484 P.2d 180 (1971), the supreme court cited *Harleysville* with approval and reaffirmed "the long-recognized and well-established legal principle prohibiting assignment of a cause of action for personal injury." *Id.* at 185, 484 P.2d at 181 (quoting *Travelers Indem. Co. v. Chumbley*, 394 S.W.2d 418, 425 (Mo.Ct.App.1965)).

*Harleysville* and *Knapp* were personal injury cases, however; and in a case of that same era, our supreme court demonstrated that, for tort claims of an economic nature, the court continued to adhere to an assignability rule. *See General Accident Fire & Life Assurance Corp. v. Little*, 103 Ariz. 435, 438, 443 P.2d 690, 693 (1968). In *General Accident*, judgment debtors assigned to their judgment creditor the right to proceed against their insurer for a bad faith failure to settle within policy limits. *Id.* at 436, 443 P.2d at 691. Our supreme court affirmed the

trial court's holding that the assignment agreement conferred on the assignee-judgment creditor the right to assert the judgment debtors' claim for insurer bad faith. *Id.* at 437, 444, 443 P.2d at 692, 699. Rejecting an attack on the standing of the assignee, the court stated, "It has long been the law in Arizona, and the law in most if not all jurisdictions that an assignee of a chose in action may maintain suit thereon in his own name." *Id.* at 438, 443 P.2d at 693.

An observer might have concluded after *Knapp* and *General Accident* that the Arizona courts continued to contrast non-assignable personal injury tort claims with other, assignable, forms of tort claims; the only change was to free the distinction from the survivability standard and ground it in a policy against traffic in pain and suffering. In *Dart*, however, the supreme court introduced uncertainty by more broadly stating the anti-assignment rule. There, the court cited *Knapp*, 107 Ariz. 184, 484 P.2d 180, for the proposition that "[g]enerally an unliquidated claim for damages arising out of a tort is not assignable." 116 Ariz. at 11, 567 P.2d at 327. The supreme court repeated that language in *Ross v. Superior Court (Dowell)*, 128 Ariz. 301, 302, 625 P.2d 890, 891 (1981).

We believe PW reads too much into the broad language of *Dart* and *Ross*. Because both *Dart* and *Ross* concerned the assignability of negligence claims for personal injuries, neither case required the court to consider the assignability of other kinds of claims arising out of torts. Further, the court did not purport in *Dart* or *Ross* to overrule the *United Verde* line of cases that articulated a general assignability rule. We therefore conclude that the broad language of *Dart* and *Ross* must be confined to its context—the context of a personal injury claim.

As PW points out, the Arizona courts have extended the non-assignability rule beyond bodily injury to legal malpractice claims. *Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114 (App.1984). We treated this extension, however, as an application of the rule against assignment of claims of an especially personal nature. *Id.* at 399, 690 P.2d at 118. Thus, we based our ruling in *Schroeder* upon the "uniquely personal" nature of the attor-

ney-client relationship and the duty imposed on the attorney. *Id.*

PW argues that tort claims arising out of the relationship between the accountant and the client are likewise "purely personal" and non-assignable. They compare the relationship of accountant-client to that of attorney-client. While we express no opinion on the assignment of a claim for accountant malpractice during performance of accounting services other than the auditing function, we perceive a difference between the relationship of an independent auditor engaged to conduct an audit and that of an attorney with a client. The United States Supreme Court recognized the same distinction when it denied work product protection to an auditor, stating:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

*United States v. Arthur Young & Co.,* 465 U.S. 805, 817–18, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826, *cert. denied,* 466 U.S. 936, 104 S.Ct. 1906, 80 L.Ed.2d 456 (1984).

In *Schroeder,* we relied in part on *Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976), to hold that an action for legal malpractice is not assignable. 142 Ariz. at 399–400, 690 P.2d at 118–19. In *Goodley,* the California Court of Appeal stated:

> It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that [legal] malpractice claims should not be subject to assignment.

133 Cal.Rptr. at 87; *accord Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg,* 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424 (1994). The attorney-client relationship is personal in both nature and objective. In contrast, from its inception the auditor-client relationship exists not merely for the benefit of the client, but also for the benefit of the shareholders and the public with whom the client may transact business.

Nothing that PW cites supports the view that a claim for auditor negligence is personal in a manner comparable to a claim for legal malpractice. In fact, the New York courts have approved the view that auditor negligence claims are to be treated like ordinary claims for conversion, negligence, or other wrongful injury to a corporate plaintiff's property, and are not extinguished upon transfer by merger. *Platt Corp. v. Platt,* 21 A.D.2d 116, 249 N.Y.S.2d 75 (1964), *aff'd mem.,* 15 N.Y.2d 705, 256 N.Y.S.2d 335, 204 N.E.2d 495 (1965).

As PW points out, the Arizona Supreme Court has treated legal and accountant malpractice actions as "similar" in the sense that both require the plaintiff to prove a professional standard of care. *See Barmat v. John & Jane Doe Partners,* 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (1987). However, this similarity does not make the accountant-client relationship analogous to the attorney-client relationship with respect to assignability of claims. In part IV of this opinion, we conclude that neither United nor Union had a fiduciary relationship with PW. Here we conclude that the economic damage claims asserted against PW were not so "personal" to United and Union that those entities could not assign them to SC. *See AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365 (S.D.Fla. 1991) (finding Rule 10b–5 claims could be validly assigned by victim to another, who could sue despite lack of personal standing).

We hold that SC has standing to bring this suit.

## III. SC/UNION'S CLAIM UNDER ARIZONA SECURITIES ACT

We next consider PW's argument that the trial court erroneously denied JNOV on SC/Union's claim for damages under the Arizona Securities Act.

The statutory basis for SC's Securities Act claim is A.R.S. § 44–1991, which provides:

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities ... directly or indirectly to do any of the following:

. . . .

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Under section 44–2001 of the Securities Act, a purchaser injured by a violation of section 44–1991 may bring a private cause of action for rescission or damages.[2]

SC brings such a cause of action, asserting that it was damaged by PW's untrue statements or misleading omissions "involving an offer to sell or buy securities or a sale or a purchase of securities, including Union's purchase of United Bancorp's stock on January 8, 1987, and Union's three public financings, dated April 7, 1986, May 14, 1986, and October 30, 1986."[3]

PW did not sell any securities to Union. PW's liability under section 44–2001 arises, if at all, pursuant to A.R.S. § 44–2003, which provides:

An action brought under § 44–2001 ... may be brought against any person, including any dealer, salesman or agent, who *made, participated in or induced* the unlawful sale or purchase, and such persons

shall be jointly and severally liable to the purchaser or seller entitled to maintain such action.

(Emphasis added.) SC does not claim that PW in any sense "made" the sale within the meaning of section 44–2003. The question therefore narrows to whether the evidence permitted the conclusion that PW "participated in or induced" the sale. *See id.*

The parties devote a portion of their briefs to federal cases interpreting federal securities statutes. *See* Securities Exchange Act of 1934, §§ 10(b), 18, 28, 28(a), 15 U.S.C.A. §§ 78j(b), 78r, 78bb, 78bb(a); Securities Act of 1933, §§ 11, 12(2), 15 U.S.C.A. §§ 77K, 77*l*(2). Because, however, there is no counterpart in those statutes to the participation-or-inducement standard of our state statute, the federal statutes do not guide us here.

The trial court granted SC partial summary judgment on its Securities Act claim, ruling that PW, as a matter of law, " 'participated in or induced' the unlawful sale of securities within the meaning of A.R.S. § 44–2003."[4] PW contends that the trial court erred in granting SC partial summary judgment on this issue. Instead, PW argues, the trial court should have awarded JNOV to PW, ruling that PW, as a matter of law, neither "participated in" nor "induced" the sale within the meaning of the statute. PW argues that its conduct did not fall within the common and ordinary meaning of the words "participated in" and "induced." It further argues that the language of A.R.S. § 44–2003, the Arizona Securities Act, and the cases interpreting the Act require either the sharing of the proceeds or the active solicita-

---

2. A.R.S. § 44–2001(A) provides:

A sale or contract for sale of any securities to any purchaser in violation of any provision of § 44–1841 or 44–1842 or article 13 [§ 44–1991 *et seq.*] of this chapter is voidable at the election of the purchaser, who may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest thereon, taxable court costs and reasonable attorneys' fees, less the amount of any income received by dividend or otherwise from ownership of the securities, upon tender of the securities purchased or the contract made, or for damages if he no longer owns the securities.

3. SC sought rescissory damages, as we shall discuss in part VII of this opinion.

4. The trial court also determined as a matter of law "that all statements made by Price Waterhouse to United relating to the financial status of United between the periods of September 1985 and January 7, 1987, and which defendant knew or should have known would be passed on to plaintiffs were statements made 'in connection with' sales of securities within the meaning of A.R.S. § 44–1991(2)...." The court reserved for the jury the question "whether the statements made by Price Waterhouse were untrue or whether said statements were statements of material fact or omissions of material fact."

tion of a securities sale before a nonseller can be liable for having "participated in or induced" the sale. PW points out that it did not share in the proceeds of the sale of United's stock to Union and did nothing to "solicit" Union's purchase of United.

In response, SC asserts that the record contains voluminous evidence that PW made representations about United's financial status and that PW was actively involved in the sale of United's stock to Union. It contends that one may "participate in" or "induce" a sale without actively soliciting the sale or sharing in its proceeds. SC relies on *State v. Superior Court*, 123 Ariz. 324, 599 P.2d 777 (1979), *overruled in part, State v. Gunnison,* 127 Ariz. 110, 618 P.2d 604 (1980), as "binding Supreme Court precedent" for its position.

*State v. Superior Court* can be interpreted as extending participation-or-inducement liability under section 44–2003 to nonparties or non-agents who make untrue statements or material omissions while providing information about corporations whose securities are being sold, even though they take no active part in bringing about the transaction and receive no consideration from it. However, the procedural circumstances of *State v. Superior Court* lead us to conclude that we should interpret neither that case nor section 44–2003 so broadly.

In *State v. Superior Court,* a group of depositors of the failed Lincoln Thrift sued officers and employees of the Arizona Corporation Commission, among other defendants. *Id.* at 327, 599 P.2d at 780. In Count I of their complaint, the depositors alleged, pursuant to A.R.S. § 44–1991(2), that the Corporation Commission defendants made untrue statements or omitted material facts in connection with the thrift associations' sales of investment certificates. Specifically, the complaint alleged that these defendants falsely represented that the associations were well regulated by the Commission, that they had made all filings required by law, that their corporate papers and insurance certificates were in order, and that they were solvent. *Id.* at 328, 599 P.2d at 781. Count II alleged, among other things, that the Corporation Commission defendants aided and abetted the thrift associations' violations by failing to properly examine the associations' applications for registration of investment certificates in accordance with standards required by law, and by failing to disclose that the associations were not properly regulated and that their surety lacked sufficient assets to insure payment of their insured obligations. *Id.* at 328–29, 599 P.2d at 781–82.

The file reflects that the defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), Arizona Rules of Civil Procedure, 16 A.R.S., for failure to state a claim upon which relief could be granted. Defendants asserted that the duties imposed on state agencies and officials were owed to the public generally, and that breaches of such duties did not give rise to individual causes of action. Petition for Special Action, *State v. Superior Court,* No. 14231 (filed Feb. 22, 1979). When the trial court denied the motion to dismiss, defendants filed a petition for special action relying exclusively on the public-private duty distinction. *Id.; see Massengill v. Yuma County,* 104 Ariz. 518, 456 P.2d 376 (1969), *overruled by Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982). In their response to the petition, the plaintiffs stated:

> Defendants are state officials who failed, in some cases negligently and in some cases willfully and maliciously, to carry out their express statutory duties to conduct annual examinations of Lincoln and U.S. Thrift Associations. Defendants allowed Lincoln and U.S. Thrift, as well as Omaha Surety, to continue operating with impunity when various defendants knew, and others should have known, that these companies were blatantly violating the law in virtually every transaction they conducted. *Various of defendants, acting both as state officials and as individuals, went so far as to actively promote these companies to unsuspecting potential depositors and actively took part in Robert Fendler's scheme to defraud the depositors.*
>
> *These facts must be taken as established since the order challenged herein is a denial of a motion to dismiss.* It is defendants who chose to move to dismiss at the outset rather than waiting for discovery to establish the facts with more precision. Defendants are therefore bound by the facts as related by plaintiffs as long as

such facts are consistent with the allegations of the complaint. The rule established by this Court is that a motion to dismiss may not be granted "unless it appears certain that the plaintiff would be entitled [to] no relief under any state of facts which is susceptible of proof under the claim as stated." *Mackey v. Spangler*, 81 Ariz. 113, 115, 301 P.2d 1026 (1956).

Response to Petition for Special Action, *State v. Superior Court*, No. 14231 (filed March 5, 1979) (emphasis added).

Confined to the issues that were framed by the pleadings, the supreme court first addressed itself to the public duty issue. After determining that Counts I and II were not based on a theory of negligence, the court stated:

> Arizona discarded the concept of sovereign immunity for tort liability over fifteen years ago. *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963). Because Counts I and II are not based on a theory of negligence, a "public duty defense," as discussed in *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969), is inapplicable. We, therefore, need only determine if the pleadings in Counts I and II adequately state claims upon which relief can be granted.

123 Ariz. at 330, 599 P.2d at 783.

The court then determined that Count I did state a cause of action against the defendants. It reasoned:

Generally speaking, a purchaser of stock has no cause of action under the Arizona Securities Act for a rescission of the sale and recovery of the money paid for stock from one who received none of the consideration and was not a party to the sale. *See Trump v. Badet*, 84 Ariz. 319, 327 P.2d 1001 (1958). Pursuant to A.R.S. § 44–2003, however, an action under A.R.S. § 44–2001 may be brought against any person, including any dealer, salesman or agent, who made, participated in or *induced* the unlawful sale or purchase. Such persons are jointly and severally liable to the purchaser. This section, therefore, clearly fixes the liability of one who induces the unlawful sale or purchase. *Trump, supra.*

The theory of Count I is clearly that the misrepresentations and omissions of the Corporation Commissioner officer defendants induced the plaintiffs to become depositors in the Associations. As such, a cause of action, pursuant to § 44–1991, is properly stated against these defendants. A.R.S. § 44–2003.

*Id.* at 331, 599 P.2d at 784.[5]

SC argues that *State v. Superior Court* held that officers and employees of the Arizona Corporation Commission can "participate in" or "induce" securities law violations when securities purchasers detrimentally

---

**5.** The court also stated concerning Count I:

The provisions of A.R.S. § 44–1991 are almost identical to the antifraud provisions of the 1933 Securities Act, 15 U.S.C. § 77q (1970) [§ 17(a)(2) of Securities Act of 1933]. *State v. Brewer*, 26 Ariz.App. 408, 549 P.2d 188 (1976). A presence of the nine elements of common law fraud are not essential to establishing a violation of 77q. *See Securities and Exchange Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir.1972). Similarly, this is the case when establishing a violation of A.R.S. § 44–1991. *See Trump, supra.* Moreover, a knowledge of falsity is not a necessary element of a cause of action based upon A.R.S. § 44–1991. *Baker v. Walston and Co.*, 7 Ariz.App. 590, 442 P.2d 148 (1968). The statute instead imposes an affirmative duty not to mislead. *Washington National Corp. v. Thomas*, 117 Ariz. 95, 570 P.2d 1268 (App.1977).

Therefore, because Count I sufficiently apprises the defendants of the charges against them and adequately states a claim upon which relief can be granted, the motion to dismiss this Count was properly denied.
123 Ariz. at 331, 599 P.2d at 784.

On motion for rehearing, the supreme court realized that it had overlooked its recent approval of a contrary court of appeals holding that knowledge of falsity [scienter] was a necessary element of liability under A.R.S. § 44–1991(2). *Greenfield v. Cheek*, 122 Ariz. 70, 593 P.2d 293 (App.1978), *approved*, 122 Ariz. 57, 593 P.2d 280 (1979). The court therefore modified its opinion and ordered dismissal of Counts I and II of the complaint with leave to amend to allege scienter. 123 Ariz. at 335, 599 P.2d at 788. Thereafter, in *State v. Gunnison*, 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980), the supreme court held that "scienter is not an element of a violation of A.R.S. § 44–1991(2), even though it may be an element of A.R.S. § 44–1991(1)," and overruled anything to the contrary in *State v. Superior Court* and *Greenfield v. Cheek*, 122 Ariz. 57, 593 P.2d 280 (1979).

rely upon incorrect information that the officers and employees have communicated to them in the course of performing their official duties. *State v. Superior Court* does not so hold. The meaning of the terms in section 44–2003 was never an issue. The only issue that confronted the court was whether the plaintiffs' claim should have been dismissed for failure to state a claim, and the court could only have approved dismissal if it determined that the plaintiffs were not entitled to relief under any facts susceptible to proof. *Id.* at 329, 599 P.2d at 782. Count I of the amended complaint in *State v. Superior Court* detailed specific omissions and representations of defendants and alleged that they constituted fraudulent practices. *Id.* at 330, 599 P.2d at 783. Based on these allegations, and accepting the allegations of the complaint as true, the supreme court determined that a cause of action for "inducing" plaintiffs to become depositors had been stated and was not subject to dismissal for failure to state a claim. *Id.* at 331, 599 P.2d at 784.

In short, *State v. Superior Court* arose from a motion to dismiss; this case arises from a trial. In that case, the court was obliged to assume the truth of allegations that certain defendants had actively promoted a fraudulent transaction; in this case, we examine evidence of a defendant's more remote relationship to a sale. In that case, the court was not obliged to determine the meaning of participation or inducement within A.R.S. § 44–2003; in this case, we are obliged to do so. Given these dissimilarities, *State v. Superior Court* does not resolve the issue that confronts us here.

■ We therefore come directly to the meaning of the phrase "participated in or induced" in A.R.S. § 44–2003. Looking to the dictionary, we find this pertinent definition of "participate":

2a: to take part in something (as an enterprise or activity) usu. in common with others ... b: to have a part or share in something....

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1646 (1969). A synonym for participate is "partake." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 858 (1985).

Although PW's audit activities were tangentially related to and concurrent with the ongoing sale, and although it generated audit information that was used by the parties to the sale, PW did not partake in the sale of United's stock to Union any more than it made the sale. PW's function—to issue audit opinions about United's financial status—did not differ from the function it would have performed had no merger or sale been in process. And though PW made its audit opinions available to Union, it is uncontradicted that PW had no stake in the sale. PW provided its opinions to Union because it was asked to do so by its audit client and because it wished to continue as United's auditor after the sale. PW did not "participate in" the sale within the meaning of A.R.S. § 44–2003.

■ The dictionary also provides this pertinent definition of "induce":

1a: to move and lead (as by persuasion or influence) ...: prevail upon: INFLUENCE, PERSUADE ... b: to inspire, call forth, or bring about by influence or stimulation .... 3a: to bring on or bring about: EFFECT, CAUSE....

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1154 (1969).

Here, we cannot resolve the statutory meaning by reference to the dictionary alone. By reading "induce" particularly expansively, we might sweep within the statute any outsider to a securities transaction—no matter how remote from the transaction—who provided information that foreseeably contributed to, and thereby *influenced*, a buyer or seller's decision to engage in the transaction.

We do not believe, however, that the legislature intended by "induce" to extend Securities Act liability so far. Rather, we believe it better fits A.R.S. § 44–2003 to give "induce" the narrower and more active construction suggested by its synonyms "persuade" and "prevail." Returning to Webster's, we find the following exposition of the active connotations of "induce":

syn PERSUADE, PREVAIL: INDUCE may indicate overcoming indifference, hesitation, or opposition, usu. by

offering for consideration persuasive advantages or gains that bring about a desired decision ... PERSUADE may suggest a winning over by an appeal, entreaty, or expostulation addressed as much to feelings as to reason ... PREVAIL may be used in situations in which strong opposition or reluctance is overcome by sustained argument and entreaty. . . .

*Id.; see also* RESTATEMENT OF TORTS § 766 cmt. d (1939) and RESTATEMENT (SECOND) OF TORTS § 766 cmt. h (1979) (hereinafter RESTATEMENT (SECOND)) (defining "induce," in tort of intentional interference with contract, as a form of "purposeful" or "intentional causation"). These sources, in our opinion, capture the meaning of "induce" that best fits its usage in A.R.S. § 44–2003.

Three aspects of the statute assist us in reaching this conclusion. First, section 44–2003 is titled "Joint and several liability of offending sellers and purchasers." The statute has carried a similar title since it was first adopted in 1951. *See* Securities Act of March 6, 1951, 1951 Ariz. Sess. Laws 46, 74 ("Liability of Offending Sellers and Purchasers"). The continuing focus of this title reveals that the legislature has always regarded "offending sellers and purchasers" as those principally subject to the civil actions permitted under section 44–2003.

Second, in extending liability to those who "ma[ke], participate[ ] in or induce[ ]" offending transactions, the legislature chose to identify the "dealer, salesman or agent" as examples of dealmakers, participants, or inducers who would qualify for joint and several liability under the statute. *See* A.R.S. § 44–2003. Dealers, salesmen, and agents have in common that they undertake on behalf of sellers or purchasers to promote the sale. Each has a financial incentive to accomplish the sale, and each engages in the kind of purposeful persuasive effort described above.

█ Third, our interpretation is supported by the structure of the Securities Act. Section 44–1991 makes it "unlawful for a person,

*in connection with* a [securities] transaction within or from this state ... [to m]ake any untrue statement of *material* fact, or omit to state any *material* fact necessary in order to make the statements made [under the circumstances] not misleading." A.R.S. § 44–1991(2) (emphasis added). Sections 44–2001 and 44–2003, however, do not provide a private civil remedy against anyone who makes a material misstatement in connection with a securities transaction. Had the legislature intended so extensive a private remedy, it could simply have done so against any person who violated section 44–1991. Instead, the legislature provided a private civil remedy only against the narrower range of persons "who made, participated in or induced the unlawful sale. . . ." A.R.S. § 44–2003.[6] Thus, PW argues, the words "made, participated in or induced" must be read:

(i) to require more than some collateral involvement in a securities transaction, because § 1991 already requires that any misstatement be made "in connection with" a securities transaction; and

(ii) to require more than that the misstatements merely had the effect of influencing a buyer to make a sale, because § 1991 already requires that any false statements be "material," i.e., that it "assume actual significance in deliberations of the reasonable buyer." [*Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (App. 1981)].

We fully agree.

For all of these reasons, we conclude that the legislature did not mean, by use of the word "induce," to stretch civil liability under the Security Act to collateral actors such as PW, remote from the transaction, who neither financially participate, nor promote or solicit the transaction, but merely provide information that contributes to a buyer or seller's decision to close the deal.

We therefore hold that PW neither "participated in" nor "induced" a securities transaction within the meaning of A.R.S. § 44–2003. The trial court erred in granting SC partial

---

6. In contrast, the Securities Act arms the Attorney General and Corporation Commission with a range of public enforcement measures against "any person" engaging in a violation of the Act. *See, e.g.,* A.R.S. § 44–2032; *see also* A.R.S. §§ 44–2036, 44–2037.

summary judgment holding that PW "participated in or induced" the United sale as a matter of law, and further erred in denying PW JNOV on SC/Union's Arizona Securities Act claim.

## IV. BREACH OF FIDUCIARY DUTY CLAIMS

We turn next to SC's common law tort claims, beginning with its claims for breach of fiduciary duty. PW moved unsuccessfully for JNOV on SC's claims for breach of fiduciary duty to Union and United, arguing that it owed no fiduciary duty to either. We separately consider PW's relationship with each bank.

### A. PW's RELATIONSHIP WITH UNITED BANK

■ PW argues that it never acted with respect to United as more than an accountant performing ordinary auditing services for a client and that, in an ordinary auditor-client relationship, no fiduciary duties arise. SC's answering brief does not address the merits of this issue, nor does SC attempt to defend the trial court's refusal to grant JNOV on the SC/United fiduciary duty claim.

The Ninth Circuit has explained why an auditor is not the fiduciary of its client:

> More often a fiduciary is a person who holds property or things of value for another—a trustee, executor, receiver, conservator or someone who acts in a representative capacity for another in dealing with the property of the other. Here, [the auditor] was acting more in the capacity of arbitrator or fact finder not for one but for two persons. The duty of PMM was not to act as fiduciary for Franklin; it was, rather, to act independently, objectively and impartially, and with the skills which it represented to its clients that it possessed, to make accurate determinations of fact. It would be liable for acting negligently or fraudulently.

We do not say that a certified public accountant may never be a fiduciary. We do say it was not here.

*Franklin Supply Co. v. Tolman,* 454 F.2d 1059, 1065 (9th Cir.1971).

For similar reasons the United States Supreme Court declined to extend work product protection to auditors:

> The ... work product doctrine was founded upon the private attorney's role as the client's confidential advisor and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. An independent certified public accountant performs a different role. By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

*United States v. Arthur Young & Co.,* 465 U.S. at 817–18, 104 S.Ct. at 1503.

SC has not brought to our attention any evidence that would support the existence of a fiduciary relationship between PW and United, and the mere status of PW as United's auditor did not give rise to such a relationship. The trial court therefore erred in denying PW's motion for JNOV on SC/United's claim for breach of fiduciary duty.

### B. PW's RELATIONSHIP WITH UNION BANK

■ PW argues that SC also failed to establish a fiduciary relationship between PW and Union.[7] SC responds that a fiducia-

---

7. SC asserts that PW waived its argument for JNOV on breach of fiduciary duty by failing to raise it in a motion for directed verdict. SC is mistaken. PW claimed in its motion for directed

verdict, as it had claimed in a prior motion for partial summary judgment, that a fiduciary relationship does not arise when an accountant is hired only to perform auditing and incidental

ry relationship was demonstrated by evidence that Union, encouraged by PW to trust in PW's auditing expertise and knowledge of United, relied on PW to ensure that closing conditions of the United purchase were met. SC also relies on the fact that Union directly relied on PW's help in preparing and registering the securities offering that Union undertook to finance the United acquisition. This evidence, however, does not suffice to establish a fiduciary relationship.

■ Our case law distinguishes a fiduciary relationship from an arm's length relationship. *See, e.g., Brazee v. Morris,* 68 Ariz. 224, 228–29, 204 P.2d 475, 477–78 (1949); *Rhoads v. Harvey Pubs., Inc.,* 145 Ariz. 142, 148–49, 700 P.2d 840, 846–47 (App.1984). Mere trust in another's competence or integrity does not suffice; "peculiar reliance in the trustworthiness of another" is required. *Stewart v. Phoenix Nat'l Bank,* 49 Ariz. 34, 44, 64 P.2d 101, 106 (1937); *Rhoads,* 145 Ariz. at 148–49, 700 P.2d 840, 846–47. A fiduciary relationship is a confidential relationship whose attributes include "great intimacy, disclosure of secrets, [or] intrusting of power." *Rhoads,* 145 Ariz. at 149, 700 P.2d at 847 (quoting *Condos v. Felder,* 92 Ariz. 366, 371, 377 P.2d 305, 308 (1962)). In a fiduciary relationship, the fiduciary holds "superiority of position" over the beneficiary. *Id.* This superiority of position may be demonstrated in material aspects of the transaction at issue by a "substitution of [the fiduciary's] will." *Herz & Lewis, Inc. v. Union Bank,* 22 Ariz.App. 437, 439, 528 P.2d 188, 190 (1974) (quoting *In re Guardianship of*

*Chandos,* 18 Ariz.App. 583, 585, 504 P.2d 524, 526 (1972)).

■ Although the existence of a fiduciary duty is generally a question of fact, "[w]hen the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue." *See Gemstar Ltd. v. Ernst & Young,* 185 Ariz. 493, 504–05, 917 P.2d 222, 233–34 (1996) (quoting *Rhoads,* 145 Ariz. at 148, 700 P.2d at 846).[8] We find the evidence insufficient to support a verdict in this case.

SC argues that the jury was entitled to find a fiduciary relationship from: (1) the testimony by Union's chief financial officer that, in deciding whether Union should purchase United's stock, he relied on PW's audit opinions concerning United's published financial statements; (2) the purchase agreement, which identified PW as United's auditor and authorized Union to receive financial information generated or reviewed by PW during the pendency of the agreement; (3) the fact that PW sent Union copies of its "comfort letters" to United as the acquisition took its course; and (4) Union's decision to rely exclusively on PW's audit in evaluating United as an acquisition prospect, foregoing evaluation by a separate accounting firm or by its in-house loan evaluation team. Such evidence, however, merely establishes that Union relied on PW's competency and integrity as an independent auditor; it does not establish a transformation of an arm's length relationship into the confidential relationship that our case law requires.

Nor does SC overcome this weakness with evidence that PW attempted to persuade Un-

accounting services for its client. The gist of SC's objection is not that PW did not raise the issue, but rather that, in its motion for JNOV, PW introduced a standard for a fiduciary relationship—surrender of substantial control—that PW had not identified in prior motions, arguments, or recommended jury instructions. *See Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa. 1986) ("In business relationships, a confidential relationship arises only if parties surrender substantial control over some portion of their business affairs to another."). We need not dwell on this objection because we do not apply the *Stainton* standard in this case. Instead we draw our standard from Arizona case law without attempting to determine the compatibility of the *Stainton* standard of substantial control.

8. In *Gemstar,* the supreme court approved the trial court's conclusion as a matter of law that the defendant accountant and his firm owed a fiduciary duty to the individual shareholders of his client and two foreign corporations. 185 Ariz. at 505, 917 P.2d at 234. There, however, the defendant accountant served as a financial adviser, not an independent auditor, and the *gravamen of the action was that defendant,* who owed duties to all limited partners, drafted agreements and structured transactions that favored some partners over others. *Id.* at 497–98, 917 P.2d at 226–27; *see also Gemstar, Ltd. v. Ernst & Young,* 183 Ariz. 148, 150–51, 901 P.2d 1178, 1180–81 (App.1995), *vacated,* 185 Ariz. 493, 917 P.2d 222 (1996).

ion to maintain PW as United's auditor and to use PW for other accounting services after Union's acquisition. PW may have pitched hard for Union/United's post-acquisition business, stressing its general auditing expertise, its reputation, and its detailed knowledge of United. But Union was clearly standing at arm's length when it received the pitch. Indeed, though Union chose to rely on PW in evaluating United's financial soundness as an acquisition prospect, Union reserved judgment on the selection of a post-acquisition auditor and ultimately engaged a different firm.

■■■ Nor is a fiduciary relationship established by Union's deference to PW's superior knowledge of United's financial statements and records. Such reliance does not establish a fiduciary relationship unless the knowledge is of a kind beyond the fair and reasonable reach of the alleged beneficiary and inaccessible to the alleged beneficiary through the exercise of reasonable diligence. *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1242 (1982) (citing *Wolf v. Brungardt*, 215 Kan. 272, 524 P.2d 726 (1974)). None of SC's evidence establishes that PW had a means of knowledge about United to which Union could not reasonably have obtained access through internal auditors or another accounting firm. Once again, mere reliance upon PW's competency and integrity as an information gatherer does not suffice.

We next consider Union's reliance upon PW for assistance in registering its common stock issue in 1986. The nature of this relationship was described by Union's controller, who testified:

> I did have discussions with people from [PW] ... when we started registration statements for raising of capital and debt by Union ... to obtain funds necessary to be able to acquire United.
>
> As part of that preparation of those financial statements, it required the involvement of [PW] because they had to assist in the preparation of proforma financial statements....
>
> As part of that, [PW] had to give a consent to the use of those financial state-

ments, and they were listed as experts as part of those financial statements.

> And they had to give a comfort letter as part of the closing, certifying that they had done various procedures and updating the financial statements to make sure that those financial statements were still accurate.

In the registration papers, Union attached consolidated financial statements of United "in reliance upon the report of [PW], independent accountants, ... and upon the authority of said firm as experts in accounting and auditing." PW reviewed and commented on Union's registration papers in draft form, approved Union's statement of reliance upon PW's report, and provided an attachment entitled "Consent of Independent Accountants," in which PW consented to the incorporation of its audit report and to its designation as an expert in accounting and auditing.

Here again, we find none of the attributes of a confidential relationship. The record does not disclose a relationship of "great intimacy, disclosure of secrets, [or] intrusting of power." *See Rhoads,* 145 Ariz. at 149, 700 P.2d at 847. It merely discloses Union's consultation with PW as United's *"independent* auditor" for assistance in preparing a registration statement that incorporated the independent audit report that PW had prepared.

■■■ In short, SC's evidence may establish that Union placed trust and confidence in PW and relied on the quality of its United audit reports; but trust, confidence, and reliance, though necessary components, do not suffice to establish a fiduciary relationship. *See id.* at 149, 700 P.2d at 840. The record does not show that Union placed such "peculiar reliance" in PW's "trustworthiness," *see id.,* as to substitute PW's will for its own. *See Herz & Lewis,* 22 Ariz.App. at 439, 528 P.2d at 190. Nor does the record show that an imbalance of specialized knowledge and bargaining power placed PW in a superior position, so that Union depended on PW for information to the degree that it ceased acting on its own behalf and ceded that function to PW.

We conclude in part VI of this opinion that SC/Union presented a submissible negligent misrepresentation claim against PW based on PW's failure to use ordinary care and skill in auditing and reporting the financial status of United. However, to affirm the submission of SC/Union's breach of fiduciary duty claim to the jury would debase the concept of fiduciary duty and confuse it with the duty to exercise ordinary care and skill. We hold that the trial court erred in denying PW's motion for JNOV on SC/Union's breach of fiduciary duty claim.

## V. CLAIMS FOR DAMAGE SUFFERED BY UNITED

We have concluded that the trial court erred in submitting to the jury SC's claim that PW breached a fiduciary duty to United. We now consider whether the trial court erred in submitting *any* SC/United damage claim.

■ SC argues that PW helped diminish the value of United "by failing to bring United's bad loans and serious internal lending control weaknesses to the attention of United's Board of Directors, something the Board hired PW to do." SC cites evidence that United's value dropped dramatically from 1985 to 1987 because of its unsafe lending and weakness in internal controls. SC also cites evidence that, if .PW had followed generally accepted auditing standards when auditing United in 1985 and 1986, certain losses discovered in 1987 would not have occurred.

Though we accept this evidence in the light most favorable to upholding the SC/United verdicts, it does not suffice. The evidence does not establish that the diminution in the value of United materialized in time to damage *United's* stockholders to the slightest degree. We distinguish United's stockholders before Union's acquisition from Union itself. Any damage to Union is contained within the SC/Union claim. The SC/United claim, to be maintainable, must stand on separate ground.

There is no separate ground. The essence of the Union claim is that Union, uninformed of United's diminution in value, paid United's stockholders more than their stock was worth. The corollary is that United's stockholders, who sold their stock for more than it was worth, were undamaged by an as yet undiscovered loss in United's value.

SC acknowledges this point in one of the briefs filed with this court. In its answering brief to PW's appeal, SC sets forth the diminution-in-value theory discussed above. But in SC's opening brief, appealing from the trial court's grant of a new trial, SC attempts to minimize the separate United and Union awards that led the trial court to conclude that the jury was "hopelessly confused." SC states:

> Because *Union's* out-of-pocket losses directly related to and flowed from *United Bank's* pre-purchase decline in value, once Standard Chartered recovered for Union's losses it would be duplicative for Standard Chartered to also recover for United Bank's loss in value. Standard Chartered's claims relating to United Bank were thus surplusage and played a minor role during trial. Indeed, neither side ever argued to the jury what *separate damages* should or should not apply to Standard Chartered's claims relating to United Bank.

By these assertions SC concedes its failure to present any evidence that justified submitting the United claims to the jury. We therefore conclude that the trial court erred in denying PW's motion for JNOV on SC/United's claims against PW.

## VI. SC/UNION'S AUDITOR NEGLIGENCE AND NEGLIGENT MISREPRESENTATION CLAIMS

SC asserted theoretically separate negligence and negligent misrepresentation claims against PW, alleging that Union was injured by (1) PW's negligent auditing of United (auditor negligence) and (2) PW's negligent communication of materially false representations concerning United (negligent misrepresentation). Both claims were supported by a single nucleus of operative fact, and the jury awarded SC identical verdicts of $338,053,768 on each, assigning 85% of the fault to PW and 15% to Union.

PW attacks the two claims differently on appeal: (1) It argues that the trial court should have granted JNOV on the auditor negligence claim; and (2) it acknowledges that the trial court properly submitted the negligent misrepresentation claim, but argues, as a basis for new trial, that the trial court erroneously instructed the jury concerning the restrictive elements of that claim. These arguments, though separate, have a common theme: that negligent misrepresentation, a more restrictive theory than ordinary negligence, was the only appropriate ground for submitting auditor negligence to the jury. We therefore address these arguments together, but first consider SC's assertion that one of the arguments has been waived.

## A. WAIVER OF AUDITOR NEGLIGENCE ARGUMENT

PW contends that the trial court should have granted JNOV on SC/Union's auditor negligence claim because PW owed no duty to Union that would support such a claim separate and distinct from the claim for negligent misrepresentation. SC argues that PW waived this point by neglecting to include it in its motion for directed verdict.

Motions for JNOV are governed by Rule 50(b) of the Arizona Rules of Civil Procedure, which provides in pertinent part:

Whenever a motion for directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 15 days after the entry of judgment, a party who has moved for a directed verdict may file a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned such party, not later than 15 days after the jury has been discharged, may file a motion for judgment in accordance with the party's motion for a directed verdict.

 Our case law treats a motion for directed verdict at the close of all the evi-

dence as a prerequisite to a later motion for JNOV. *Ash v. Flieger,* 118 Ariz. 547, 548, 578 P.2d 628, 629 (App.1978). Further, because a motion for directed verdict must state the specific grounds on which relief is sought, Ariz. R. Civ. P. 50(a), and because the motion for JNOV renews the motion for directed verdict, the scope of the former is generally limited by the scope of the latter. *See Bond v. Cartwright Little League, Inc.,* 112 Ariz. 9, 15–16, 536 P.2d 697, 703–04 (1975); *In re Estate of Schade,* 87 Ariz. 341, 348, 351 P.2d 173, 178 (1960).

We explained the linkage of the motions in *Chavez v. Tolleson Elementary School District,* 122 Ariz. 472, 476, 595 P.2d 1017, 1021 (App.1979):

The rule requiring the issue to be raised on the motion for directed verdict is based upon the premise that the claimed omission in proof might be cured by a reopening of plaintiff's case if the trial court finds merit to the motion. This is obviously not possible when the issue is raised for the first time after trial on a motion for judgment N.O.V.

 In this case, however, we face an issue beyond the *Chavez* rationale and not previously addressed by Arizona courts. Here, PW does not assert an omission in proof that SC might have cured by reopening its case. Rather, it raises a pure issue of law that would not have been susceptible to the introduction of further evidence, even if PW had raised it at the directed verdict stage. Further, SC was aware before PW's motion for JNOV of PW's position that it owed Union no duty that would support an auditor negligence claim; the parties had addressed that question in summary judgment briefing before trial. In circumstances such as these, respected treatises on procedure commend a relaxation of the linkage rule.

For example, the Wright and Miller treatise on Federal Practice and Procedure states:

A renewed motion for judgment as a matter of law under Rule 50(b) is not a condition precedent to appeal from a final judgment. If there have been errors at the trial, duly objected to, dealing with

matters other than the sufficiency of the evidence, they may be raised on appeal from the judgment even though there has not been either a renewed motion for judgment as a matter of law or a motion for a new trial, although it is better practice for the parties to give the trial court an opportunity to correct its errors in the first instance.

9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2540, at 366 (2d ed.1995) (footnote and citations omitted). Moore expresses a similar view:

> If a district court commits an error on a dispositive pure issue of law that is both unrelated to the sufficiency of the evidence and raised prior to submission of the case to the jury, does the fact that a party failed to move for judgment as a matter of law on that issue at the close of all the evidence preclude the district court from correcting its error under Rule 50(b)? We urge that the answer should be "No".....

5A JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 50.08, at 50–95 (2d ed.1995).

Case law also supports this view. In *Federal Savings & Loan Insurance Corp. v. Reeves*, 816 F.2d 130, 138 (4th Cir.1987), the court cautioned against "rigid application" of the motion-for-directed-verdict requirement in cases that do not fit the purpose of the rule. The court observed:

> [p]laintiff had adequate notice of this challenge from defendant's answers to the complaint and amended complaint, and there is no suggestion that plaintiff could have produced any additional evidence that would have been pertinent to this legal issue. We will not be forced to recognize a cause of action because of a procedural error which did not prejudice the plaintiff.

*Id.; accord Anderson v. United Tel. Co.*, 933 F.2d 1500, 1503 (10th Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 375, 116 L.Ed.2d 327 (1991); *Kladis v. Brezek*, 823 F.2d 1014, 1017 (7th Cir.1987) (question whether civil rights plaintiff had constitutional right to be informed of charges against him upon arrest

was not waived by defendant's failure to move for directed verdict on that ground).

We find these authorities persuasive and conclude that PW's auditor negligence argument was not waived.[9]

### B. PRIVITY, FORESEEABILITY, AND SECTION 552

PW urges that it owed Union no duty that could support an auditor negligence claim. PW bases this contention in part on an assertion that Arizona law should require privity of contract or an intended third-party beneficiary relationship as a condition to imposing auditor negligence liability, and in part on the assertion that there is no auditor negligence claim separate and distinct from a negligent misrepresentation claim.

The answer to PW's call for privity lies in *Donnelly Construction Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 187, 677 P.2d 1292, 1295 (1984), where the supreme court stated, "There is no requirement of privity in this state to maintain an action in tort."

In *Donnelly*, a construction contractor sued a firm of architects, claiming that errors in the architects' plans and specifications that masked significant construction costs had led the plaintiff, the successful bidder, to submit too low a bid. The trial court granted the architects' motion to dismiss, finding, because of a lack of privity between the parties, that the architects owed the contractor no duty of care. The supreme court reversed. Rejecting any privity requirement, the court stated:

> [A]n action in negligence may be maintained upon the plaintiff's showing that the defendant owed a duty to him, that the duty was breached, and that the breach proximately caused an injury which resulted in actual damages. *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200 (1983). Duty and liability are only imposed where both the plaintiff and the risk are foreseeable to a reasonable person. This Court has held that a broad view will be taken of the class

---

9. We also address this issue to provide guidance to the trial court and the parties, as it is likely to recur on remand.

of risks and the class of victims that are foreseeable. *McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980).

*Id.*

In the course of its opinion, the supreme court expressly overruled *Blecick v. School District No. 18,* 2 Ariz.App. 115, 406 P.2d 750 (1965), which had imposed a privity requirement for contractors' suits against architects. The court then expanded its ruling as·follows:

Our decision herein necessitates a review of Arizona cases other than *Blecick* which have denied negligence actions against certain professionals because of a lack of privity. [describing *Phoenix Title & Trust Co. v. Continental Oil Co.,* 43 Ariz. 219, 29 P.2d 1065 (1934) (negligence liability of title abstractor required privity of contract) and *Chalpin v. Brennan,* 114 Ariz. 124, 559 P.2d 680 (App.1976) (legal malpractice liability required privity) ]. We do not intend to use this opportunity to set forth foreseeability standards for each and every professional. However, we do expressly disapprove such blanket denials of causes of action as the two just set forth.

*Donnelly,* 139 Ariz. at 188, 677 P.2d at 1296.

The court cautioned that it was not adopting a universal standard of culpability for all professions, and that it would resolve such questions case by case. *Id.* The court's rejection of privity, however, was flat, declarative, and unequivocal, and it guides us in rejecting PW's call to impose a privity barrier to auditor negligence claims.

We do not, however, read *Donnelly* as extending the liability of *all* professionals to include "foreseeable injuries to foreseeable victims which proximately result from their negligent performance of their professional services." *See id.* Specifically, we reject SC's assertion, based on *Donnelly,* that accountant liability for negligent audits should extend to any foreseeable victim who falls within the range of foreseeable risk. First, as we have noted, the *Donnelly* court expressly declined to adopt foreseeability as the yardstick of measure for all professional liability. Second, we conclude, for reasons that follow, that the gravamen of auditor

negligence is negligent misrepresentation, a tort for which the Arizona courts have already adopted the narrower range of risk set forth in Restatement (Second) § 552 (1979) ("section 552").

Section 552 provides in pertinent part:

**Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in subsection (3) [not relevant in this case], the liability stated in Subsection (1) is limited to loss suffered

(a) By the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) Through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

In subsection 552(2), the Restatement (Second) deliberately rejects foreseeability as the proper measure of the range of liability. The drafters make the distinction plain in comment h:

[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or *a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.*

**30**

RESTATEMENT (SECOND) § 552 cmt. h (emphasis added).

Arizona courts have recognized the tort of negligent misrepresentation since *Van Buren v. Pima Community College District Board,* 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976). Our supreme court stated in *Donnelly* that negligent misrepresentation claims are governed by section 552. 139 Ariz. at 188, 677 P.2d at 1296. And in *Donnelly* and later cases, Arizona courts have repeatedly accepted section 552(2) as defining the range of liability for such claims. *See id.* at 189, 677 P.2d at 1297 [10]; *Hoffman v. Greenberg,* 159 Ariz. 377, 379–80, 767 P.2d 725, 727–28 (App. 1988); *Western Technologies,* 154 Ariz. at 3, 739 P.2d at 1318, 1320 (App.1986).

We come then to PW's contention that to permit SC to submit a separate and distinct auditor negligence claim under a foreseeability test "would sanction an end-run around RESTATEMENT (SECOND) § 552, which represents the law in Arizona for negligent misrepresentation-based claims against professionals." We agree. We engaged in a similar compression of theories in *Western Technologies.* There, the defendant engineering firm was engaged to investigate the cause of cracks in Sun Devil Stadium and report its findings to the Arizona Board of Regents. In its report, the defendant identified the plaintiff firm, which had performed geo-technical engineering testing prior to expansion of the stadium, as a party responsible for the cracks. The plaintiff filed a complaint that included several counts of negligence. We concluded, however, that these counts boiled down to a single negligent misrepresentation claim:

> The essence of these counts is that [the defendant] negligently, recklessly or intentionally supplied the Board with false and misleading information. While the record in this case indicates that at times [the

plaintiff] seemed to assert a negligence claim separate and apart from these representations, we are unable to glean from the complaint any negligence claim other than a claim for negligent misrepresentation. 154 Ariz. at 3, 739 P.2d at 1320. Rejecting foreseeability of harm as an appropriate standard of liability for these counts, the court applied the narrower range of liability defined by section 552. *Id.*

In *Hoffman,* Division Two of this court similarly applied section 552(2)(b) to a claim of damage from a negligent real estate appraisal. After acquiring two parcels of real property that defendants had appraised, the plaintiff sued defendants for overstating the property value in their appraisal. The defendants, however, had appraised the property for its owner—not for plaintiff—and the owner had refused to inform defendants how he intended to use their appraisal report. Though it was reasonably foreseeable that an owner might show an appraisal to prospective buyers, the court declined to measure liability by the standard of reasonable foreseeability. 159 Ariz. at 379–80, 767 P.2d at 727–28. Because this owner neither informed the appraisers that he intended to supply the appraisal to a group or class of prospective buyers, *see* section 552(2)(a), nor even that he contemplated a sale, *see* section 552(2)(b), the court found that the buyer had failed to state a claim under section 552 and that his complaint was properly dismissed. *Id.*

We have stated that the gravamen of SC's auditor negligence claim *is* negligent misrepresentation. SC claims that, as a result of negligently gathering and reviewing information in its audit of United, PW supplied Union materially false financial information about United that SC relied on to its detriment. The tort of negligent misrepresenta-

---

**10.** The supreme court observed in *Donnelly* that section 552 "does not require privity to maintain a cause of action. Subsection (2)(a) acknowledges that persons, for whose benefit or guidance the representation is made, may bring a claim against the maker of the representation." 139 Ariz. at 189, 677 P.2d at 1297. The court separately examined the plaintiff's negligence and negligent misrepresentation claims, applying the foreseeability standard to the former and the

narrower section 552 standard to the latter. The court did not consider there—as this court later considered in *Western Technologies, Inc. v. Sverdrup & Parcel, Inc.,* 154 Ariz. 1, 739 P.2d 1318 (App.1986), and as we are obliged to consider here—whether the circumstances would support an ordinary negligence claim separate and distinct from the negligent misrepresentation claim.

tion, as defined in section 552, encompasses negligence both in gathering and communicating information. *See* RESTATEMENT (SECOND) § 552 cmt. e ("The defendant is subject to liability if . . . he has failed to exercise the care or competence of a reasonable man *in obtaining or communicating the information.*") (emphasis added). Further, the limitations of section 552 were plainly drafted with auditor negligence of this nature in mind. The Restatement repeatedly poses hypothetical instances of auditor negligence to illustrate the liability limits of subsection (2). *See* RESTATEMENT (SECOND) § 552 cmt. h, illus. 5–7 & 10, & cmt. j, illus. 14–15. We do not believe the Restatement drafters undertook in section 552 to narrow the range of liability for torts of misrepresentation such as auditor negligence in the expectation that a plaintiff could escape such limitations merely by attacking the same conduct in an ordinary negligence count.[11] We therefore conclude that SC may not submit a claim for auditor negligence separate and distinct from its negligent misrepresentation claim.

## C. THE JURY INSTRUCTION ON NEGLIGENT MISREPRESENTATION

We turn next to PW's contention that the trial court erroneously defined the elements of negligent misrepresentation to the jury. PW advances this argument as an independent basis for sustaining the trial court's grant of a new trial. The court instructed the jury as follows:

In order to prevail on a claim of negligent mis-representation, any plaintiff seeking recovery has the burden of proving that:

1. Defendant, in the course of its business, gave incorrect information for the guidance of others in their business transactions;

2. Defendant intended that plaintiff rely on that information *or could reasonably foresee* that plaintiff would rely on that information;

3. Defendant failed to exercise reasonable care in obtaining or communicating that information;

4. Plaintiff relied on that incorrect information;

5. Plaintiff's reliance was justified; and

6. Plaintiff's reliance was a cause of damage to plaintiff.

(Emphasis added.)

PW contends that, to the extent the trial court permitted the jury to find PW liable if it "could reasonably foresee" that Union would rely on the information supplied, its instruction misstated the law. PW argues that the trial court should have given PW's proposed instruction, which, though similar to the court's instruction in most respects, omitted any reference to foreseeable reliance and instead required proof:

That Union was the entity for whose benefit and guidance defendant intended to supply the information or knew that the recipient intended to supply the information[; and]

That Union suffered loss through reliance upon it in a transaction that defendant intended the information to influence or knew that the recipient so intended or in a substantially similar transaction.

SC responds that, under *Donnelly,* reasonably foreseeable reliance was sufficient. Neither side is wholly correct.

■■■ The cases we have cited, including *Donnelly,* make it clear that the tort of negligent misrepresentation is governed by section 552 of the Restatement in Arizona; and the trial court's instruction was plainly inconsistent with section 552. Under the trial court's instruction, PW could have been liable to any person in "the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." *See* RESTATEMENT (SECOND) § 552 cmt. h. Liability for negligent misrepresentation does not extend so far. *Id.* On the other hand, neither is liability confined, as PW's instruction sought to confine it, precisely to "*the entity* for whose benefit and guidance defendant intended to supply the information

---

11. The policy reasons for confining auditor negligence within the liability range set forth in section 552 are stated at length in *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 61–65, 834 P.2d 745, 755–59 (1992), and we will not reiterate them here.

or knew that the recipient intended to supply the information." (Emphasis added.) It is enough that the maker know that *the recipient* intended to supply the information for the benefit of a limited group or class of persons and that the plaintiff be a member of that limited group or class. *See* RESTATE-MENT (SECOND) § 552(2)(a) & cmt. h.

We do not hold the instruction error so *significant, given the evidence in this case,* as to independently support the grant of a new trial. We uphold the new trial order on separate grounds. We do decide, however, for the reasons stated, that the negligent misrepresentation instruction must be modified on remand.

## VII. PROXIMATE CAUSE AND OUT-OF-POCKET DAMAGES

PW argues that it was entitled to JNOV on SC's negligence claims because SC failed to prove proximate cause and out-of-pocket damages. Because these issues are conceptually related, we address them together.

SC contends that PW waived SC's alleged failure to prove proximate cause as a basis for JNOV by failing to object to jury instructions on causation and by proposing the causation instruction that actually went to the jury. SC also contends that PW waived SC's alleged failure to prove out-of-pocket damages as a basis for JNOV by failing to move for directed verdict on that issue and by failing to object to SC's broadly-worded jury instruction on damages. We need not resolve SC's assertions of waiver. Instead, we assume *arguendo* that PW preserved both grounds for JNOV, and we conclude that SC presented sufficient evidence on each to withstand a directed verdict.

### A. PROXIMATE CAUSE

PW argues that SC did not introduce evidence from which a jury could reasonably find that PW's alleged negligence proximately caused any damage to SC. It was not enough, PW asserts, for SC to show cause-in-fact—that is, that Union would not have bought United's stock if PW had accurately audited United and reported the true value of its assets and the extent of its bad loans.

SC had the additional burden, according to PW, to prove proximate cause or "loss causation"—that is, that PW's misrepresentation adversely affected the objective value of what Union bought. *See McGonigle v. Combs,* 968 F.2d 810, 821 (9th Cir.1992), *cert. dismissed sub nom., Casares v. Spendthrift Farm, Inc.,* 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992).

SC does not dispute that it was required to prove loss causation. It argues rather that it met that burden by introducing evidence that, because of PW's negligent audit, Union paid far more to purchase United than United was worth.

We begin our discussion of this argument with the proposition that tort damages comprehend all damages "legally caused" by the tort. *Thompson v. Better-Bilt Aluminum Prods. Co.,* 171 Ariz. 550, 554, 832 P.2d 203, 207 (1992), *aff'd on other grounds,* 187 Ariz. 121, 927 P.2d 781 (1996). To legally cause damage, "the tort must be 'a substantial factor in bringing about the harm.'" *Id.* (quoting RESTATEMENT (SECOND) § 431(a)).

Legal causation in the tort of misrepresentation is addressed in Restatement (Second) § 548A:

A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.

The Restatement distinguishes actionable losses caused by misrepresentation from non-actionable losses resulting from independent market forces:

[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented. On the other hand, there is no liability when the value of the stock goes down after the sale,

not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition.

*Id.* cmt. b.[12]

Federal securities decisions have required similar proof. *See, e.g., Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992); *McGonigle,* 968 F.2d at 821; *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683–84 (7th Cir.1990), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). In *McGonigle,* the Ninth Circuit usefully distinguishes loss causation from transaction causation:

> [Plaintiffs] ... argue that their loss was "caused" by the misrepresentations simply because the misrepresentations of the "quality" of their investment induced them to buy the shares which then declined in value. The misrepresentations, they argue, caused the loss because the loss would not have occurred if the misrepresentations had not been made. We reject this interpretation, because it renders the concept of loss causation meaningless by collapsing it into transaction causation. The dual and independent requirements of transaction causation and loss causation, as we noted in *[Securities Investor Protection Corp. v.] Vigman,* [908 F.2d 1461 (9th Cir. 1990), *rev'd,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ], are analogous to the basic tort principle that a plaintiff must demonstrate both "but for" and proximate causation. *Id.* at 1467–68. As the Fifth Circuit stated in *[Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part, rev'd in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ], "[t]he plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causa-

tion requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value." *See also Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685–86 (7th Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990) (plaintiffs must demonstrate that misrepresentation caused loss in order to establish liability under Rule 10b–5). Application of these principles here leads us to the conclusion that the plaintiffs were required to show that the alleged omissions adversely affected the objective value of their investment in Spendthrift, causing the loss for which they seek to recover.

968 F.2d at 821.

We apply the requirement of loss causation in this case, but find that it does not support PW's argument for JNOV. PW contends on appeal, as it contended at trial, that Union's losses on the purchase and resale of United did not result from any auditing misrepresentation of the intrinsic value of United, but rather from an unrelated, postpurchase decline in the Arizona real estate market. SC, however, introduced evidence of nine major problem loans that existed in United's portfolio before any decline in the real estate market. SC argues, "These and other such problem loans were bad in 1985 and 1986 because of poor underwriting, not because of any market decline. And the problems remained undisclosed because of PW's grossly substandard audit work."

To reach the jury on the issue of proximate cause, SC need only have shown that United's value *when Union purchased it* was quantifiably lower than United's financial statements, as certified by PW, represented that value to be. We agree with SC that it supplied such evidence by detailing problem loans in United's portfolio, which PW's audit failed to discover or disclose, and whose actual values were far lower than their face values. By proving that PW negligently over-

---

**12.** Although the Restatement contains a separate section addressing recovery for pecuniary losses legally caused by a negligent misrepresentation, it does not explicitly set forth the standard for proximate cause. *See, e.g.,* RESTATEMENT (SECOND) § 522B ("Damages for Negligent Misrepresentation"). However, section 548A, which expressly

concerns claims of *fraudulent* misrepresentation, is applicable to claims of *negligent* misrepresentation as well. *See Pearson v. Simmonds Precision Prods., Inc.,* 160 Vt. 168, 624 A.2d 1134, 1137 (1993); *Bily,* 11 Cal.Rptr.2d 51, 834 P.2d at 777 (Kennard, J., dissenting).

stated the intrinsic value of United's assets in its financial statement and thereby contributed to Union's decision to buy an asset that was worth less than it was represented to be, SC adequately satisfied its burden to establish that the misrepresentation "was in some reasonably direct, or proximate, way responsible for [its] loss." *See id.*

PW also argues that SC was required to demonstrate "the *extent* to which the alleged understatement of [United's] loan loss reserves caused a decrease in [United's] value as of the acquisition date." (Emphasis added.) This argument, however, rests entirely on the assertion that SC failed to prove United's value on the acquisition date, and we address it in our subsequent discussion of SC's proof of out-of-pocket damages. Suffice it for present purposes to say that SC's evidence not only showed that PW's nondisclosure of United's problems contributed to Union's decision to buy United, but also demonstrated that the nondisclosure concealed a reduced value of United's stock. Such evidence justified the denial of PW's motion for JNOV on the issue of proximate cause.

### B. OUT-OF-POCKET DAMAGES

To prevail on its claim of negligent misrepresentation, SC was required to prove its out-of-pocket damages. PW argues that SC failed to do so and presented evidence of rescissory damages only. Accordingly, PW argues, it is entitled to JNOV on SC's remaining negligence claim. To consider this issue, we first distinguish between out-of-pocket and rescissory damages.

#### 1. Distinction Between Out–of–Pocket and Rescissory Damages

■ Compensatory damages are intended to compensate a tort plaintiff for losses suffered. RESTATEMENT (SECOND) § 903. When the harm is limited to pecuniary interests, "compensatory damages are designed to place [the plaintiff] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed." *Id.* cmt. a.

■ Out-of-pocket damages—a type of compensatory damages—consist of the difference between the purchase price of property and its actual value when purchased. *Id.* § 549 cmt. c; FOWLER V. HARPER, ET AL., LAW OF TORTS § 7.15, at 478 (Oscar S. Gray ed., 2d ed.1986); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 110, at 767 (5th ed.1984). Out-of-pocket damages are calculated as of the date of purchase and do not include collateral expenses incurred before or after the transaction. DAN B. DOBBS, 1 LAW OF REMEDIES § 9.2(1), at 549 (2d ed.1993).[13]

■ Rescission, an equitable remedy, is not a damage award at all. Rather, it contemplates the "undoing of the transaction," whereby each party gives back to the other what it parted with in the original transaction. *See Reed v. McLaws,* 56 Ariz. 556, 562–63, 110 P.2d 222, 225–26 (1941); *Jennings v. Lee,* 105 Ariz. 167, 171, 461 P.2d 161, 165 (App.1969). But when rescission, though appropriate, is impossible or infeasible (as when the buyer has sold the property to a third party), courts may substitute rescissory damages. *See In re MAXXAM, Inc.,* 659 A.2d 760, 775 (Del.Ch.1995); *Barshak v. Buccheri,* 406 Mass. 187, 547 N.E.2d 23, 26–27 (1989).

■ "Rescissory damages are a 'money award designed to be as nearly as possible the financial equivalent of rescission.'" *MAXXAM,* 659 A.2d at 775 n. 15 (citation omitted); *see also* L. LOSS, FUNDAMENTALS OF SECURITIES REGULATION 1020 (1983), *quoted in Randall v. Loftsgaarden,* 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986) ("[D]amages are to be measured so as to result in the substantial equivalent of rescission."). The goal of rescissory damages "is to return an injured party to the position ... [it] was in before entering into a transaction." *Darnall Kemna & Co. v. Heppinstall,* 851 P.2d 73, 78 (Alaska 1993) (citation omitted); *see also Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1337 (8th Cir.1991), *aff'd,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In securities litigation, rescissory damages, where appropriate, are commonly

---

**13.** We discuss the recovery of collateral expenses as consequential damages *infra* part VII(B)(3)(a).

measured as "the consideration paid [by the plaintiff], reduced by the amount realized when he sold the security and by any 'income received' on the security." *Randall,* 478 U.S. at 656, 106 S.Ct. at 3149 (citation omitted); *see also Reves,* 937 F.2d at 1336–37.

■ When comparing out-of-pocket and rescissory damages, the fundamental distinctions are these: (1) out-of-pocket damages accept the transaction as completed, whereas rescissory damages attempt to undo it; and (2) out-of-pocket damages are measured by reference to the value of the property *on the date of the transaction,* while rescissory damages, in order to approximate the undoing of the transaction, take account of the value of the property, and any income produced by it, *after the date of the transaction.*

### 2. SC was Required to Prove Out–of–Pocket Damages

■ As we have previously discussed, SC was permitted by the trial court to submit an Arizona Securities Act claim to the jury. And under § 44–2001(A) of the Securities Act, a litigant may seek rescissory damages.[14] With respect to SC's negligence claims, however, the trial court ruled by partial summary judgment that SC was limited to an out-of-pocket measure of its general damages. Though SC does not contest this ruling, the parties dispute whether SC introduced such proof.

The Restatement (Second) supports the trial court's ruling that SC must prove its out-of-pocket damages. In its section on damages for negligent misrepresentation, the Restatement provides:

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction

and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

RESTATEMENT (SECOND) § 552B. In subsection (a), the Restatement provides an out-of-pocket measure for general damages; in subsection (b), it provides for such additional consequential or special damages as the plaintiff may prove.

The out-of-pocket measure of general damages is especially appropriate here because PW was not a party to the underlying contract. *See* PROSSER AND KEETON, *supra,* at 768 (out-of-pocket damages "must of necessity be adopted where the defendant is a third party who has made no contract with the plaintiff . . ."). Moreover, because rescission is primarily a remedy between principals, rescissory damages ought not be available against a third party, like PW, who has not been unjustly enriched. *See* HARPER ET AL., *supra,* § 7.15, at 488–89.[15] Therefore, to recover on its negligence claims, SC was required to prove out-of-pocket and/or consequential damages rather than rescissory damages.

### 3. SC's Proof of Damages

PW contends that the trial court erred in denying its motion for JNOV on SC's negligence claims because SC failed to prove an indispensable element of out-of-pocket damages—the value of United on the date of purchase, January 8, 1987.[16] PW argues that, instead of establishing out-of-pocket damages on its negligence claims, SC relied solely on a rescissory damage study (the "damage study") to establish the damages for its Securities Act and negligence claims.

In response, SC intimates that the damage study represented SC's "consequential" damages from PW's alleged misrepresentations.

---

14. *See* note 2, *supra.*

15. Rescissory damages are permitted, however, against certain non-principals in Arizona Securities Act claims under A.R.S. §§ 44–2001(A) and 44–2003. *See* discussion *supra* part III; *see also Bruschi v. Brown,* 876 F.2d 1526, 1532 (11th Cir.1989) (rescissory damages permitted in feder-

al 10b–5 claim against third parties unjustly enriched).

16. The other element of out-of-pocket damages, the $334,239,255 paid for United stock, was undisputed.

SC also asserts that it did introduce evidence of the value of United's stock on the date of purchase. We conclude that, although the damage study established neither out-of-pocket nor consequential damages, SC provided sufficient evidence of out-of-pocket damages through the testimony of Marc Perkins, an expert witness, to withstand PW's motion for JNOV.

### a. SC's Damage Study

■ In its damage presentation, SC relied upon a damage study to support the argument that its damages consisted of a "Net Loss on Investment" in the amount of $338,053,768. SC calculated this loss as the difference between its gross investment in United, including borrowing costs and the cost of supporting assets retained after the resale to Citibank, and its receipts over the life of the investment, including dividends on the United stock and the proceeds from the resale to Citibank.

Obviously, this calculation included elements—the United dividends, the Citibank proceeds, the cost of supporting retained assets—that were not part of the original transaction. As subsequent events, these would have been proper elements of a rescissory damage calculation, but they were not proper elements of an out-of-pocket damages calculation. *See* DOBBS, *supra,* § 9.2(1), at 549.

Indeed, the damage study's calculations mirror the measure of rescissory damages in securities actions: "the consideration paid, reduced by the amount realized when [the plaintiff] sold the security and by any 'income received' on the security." *See Randall,* 478 U.S. at 656, 106 S.Ct. at 3149 (citation omitted); *see also* A.R.S. § 44–2001(A) (providing for rescissory damages in Arizona Securities Act claims). The damage study includes all the elements necessary to calculate rescissory damages—consideration paid, proceeds from the resale, and income received from the asset—but includes only one of the two

elements necessary to prove out-of-pocket damages—consideration paid. *See* RESTATEMENT (SECOND) § 549 cmt. c. It does not include any evidence of the actual value of United on January 8, 1987—the date of its purchase by Union.

We therefore conclude that SC did not establish its out-of-pocket damages through the damage study. And because general damages for negligent misrepresentation must be established by an out-of-pocket measure, it follows that SC failed to establish general damages through the damage study.

■ Consequential damages, however, are also recoverable in a negligent misrepresentation claim. *See* RESTATEMENT (SECOND) § 552B(1)(b). We therefore consider SC's argument that its damage study represented consequential damages recoverable on that claim.

■ Consequential damages are losses "not inherent in the nature of the transaction." *See* RESTATEMENT (SECOND) § 549 cmt. a.[17] Consequential damages must be shown to be proximately caused by the misrepresentation. LAW OF REMEDIES § 3.4, at 318–21. "It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered." PROSSER & KEETON § 110, at 767. Consequential damages for misrepresentation do not include costs that the plaintiff would have incurred even if the misrepresentation had not been made. *See Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 453 N.Y.S.2d 750, 755–56 (1982).

The expenditures reflected in the damage study, aside from the purchase price, consist of the costs of funding the purchase and the payments required to support the assets retained by Union after the resale to Citibank. These expenditures were inherent in the underlying transaction and would have been incurred regardless of PW's misrepresentations. Accordingly, they are not recoverable

---

17. Restatement (Second) § 552B cmt. a provides:

> The rule stated in this Section applies, as the measure of damages for negligent misrepresentation, the rule of out-of-pocket loss that is

stated as to fraudulent misrepresentations in Subsection (1) of § 549. Comments *a* to *f* under § 549 are therefore applicable to this Section, so far as they are pertinent.

as consequential damages. *See* RESTATE-MENT (SECOND) § 549 cmt. a.

SC, however, cites *Elar Investments, Inc. v. Southwest Culvert Co.*, 139 Ariz. 25, 676 P.2d 659 (App.1983), a breach of contract case, as support for its argument that the costs of funding an investment are consequential damages. In that case, this court held that interest costs incurred in financing a construction project are recoverable either as direct or incidental damages. *Id.* at 28–29, 676 P.2d at 662–63. But the interest costs at issue in *Elar Investments* were not the costs of funding the underlying transaction; they were additional project-financing expenditures, over and above normal project-financing costs, that were caused by the defendant's breach (a delay in delivering materials). *Id.* at 27, 676 P.2d at 661. *Elar Investments* does not support SC's position.

Because the damage study represented neither out-of-pocket damages nor consequential damages, it does not support the jury's award of damages on SC's negligence claims.

### b. Perkins' Testimony

■ To prove its out-of-pocket damages, SC was required to present evidence of the value of United on the date of purchase. SC argues that, even if it failed to do so through the damage study, it did so sufficiently to withstand PW's motion for JNOV through the testimony of investment expert Marc Perkins. We agree.

Perkins testified that, if the loan losses were as SC alleged them to be, United would have been unsalable and therefore worthless on the date Union bought it:

Q. [by counsel for SC]: Well, have you, in this case—let's get right to it—rendered an opinion as to the value of United Bank—United Bancorp, I should say, as of January 8, 1987?

A. [by Perkins]: Well, I have an opinion as to what the value would have been if—or what the value was under the assumption that the loan losses quantified by Mr. Zacharias and Mr. Marusich as of that

date were, in fact, a reasonable statement of the actual loan losses and that they were reasonably accurate. That the value of the institution would have, essentially, been zero, that the bank would have been unsalable.

This testimony unambiguously assigned United a zero value on the purchase date. Such evidence, if believed by the jury, would have permitted it to calculate out-of-pocket damages as the difference between the amount paid by SC on January 8, 1987 ($334,239,255) and United's actual value on that date ($0).

PW, however, argues that this evidence had such minimal probative value that reasonable people could not rely upon it to support an award of damages, and therefore was insufficient to withstand a motion for JNOV. *See Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). We disagree.

■ Perkins was an expert in the investment business: he was the chief executive officer of a company whose principal business was to execute securities transactions for institutional investors, and a principal in another firm that provided investment advice for individual and institutional investors. In these capacities, Perkins was active in several mergers and acquisitions involving major banks. He was therefore qualified to offer his opinion of the value of United.

Perkins testified about the tens of thousands of pages of documents he read in the process of forming his opinion, and described at length the reasons for his opinion. He opined that United was a failing institution because its high number of nonperforming assets dangerously lowered its capital. He concluded that the disclosure of that information, which was required under regulatory standards, would have so greatly eroded public confidence in United as to render it worthless. Because Perkins' testimony was subject to extensive cross-examination, any dispute over the accuracy or credibility of his opinion was for the jury to decide, not this court.[18]

---

18. We similarly resolve PW's assertion that Perkins' zero evaluation was rendered inherently implausible by the resale of United to Citibank for roughly two hundred million dollars. Per-

We acknowledge that Perkins' assessment of United's value on the purchase date was an isolated and largely undeveloped source of evidence of out-of-pocket damages. In a trial spanning almost one year, SC offered no other evidence that would support an out-of-pocket calculation. Nor did SC request a jury instruction that would explain out-of-pocket damages to the jury. Nor did SC argue out-of-pocket damages to the jury. Instead, SC relied exclusively on its rescissory damages study to establish damages on all claims. We will discuss these factors in the next section of this opinion, where we explain our grant of a new trial. In this section, however, we limit our discussion to PW's motion for JNOV. We conclude that SC submitted sufficient evidence of out-of-pocket damages to withstand that motion by introducing evidence of the purchase price of United and, through Perkins, of United's value on the purchase date.

## VIII. HOPELESS CONFUSION OF THE JURY

The trial court concluded in granting a new trial that, because SC's tort and Securities Act claims were based on the same rescissory damage study, the jury's disparate damage verdicts on those claims were "irreconcilably inconsistent." The court additionally found it impossible to reconcile the jury's identical verdicts on SC's separate Union and United claims:

> The jury returning a verdict for United in the same amount that it did for Union is blatantly erroneous. Again, it is clear that the verdicts in both cases were based upon Plaintiffs' rescissionary damage study. This study included cost of financing which clearly could not have been damages accruing to United. Again, the jury was either hopelessly confused or the verdicts are irreconcilable. Either way, the verdicts cannot stand.

Finding liability and damages issues "inextricably interwoven," the court granted a new trial on both.

■ Rule 59(a)(8) of the Arizona Rules of Civil Procedure permits the grant of a new trial on the ground "[t]hat the verdict, decision, findings of fact, or judgment is not justified by the evidence or is contrary to law." Confusion of the jury is a proper basis for concluding that a verdict "is not justified by the evidence or is contrary to law." *See, e.g., C.O. Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1360–61 (9th Cir.1976) (upholding trial court's grant of a new trial based on excessive damage award where evidence concerning proximate cause and actual damages was confusing), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *see also* FEDERAL PROCEDURE, L.Ed. §§ 58.14, 58.15, at 750–51 (1984); 58 AM.JUR.2D NEW TRIAL § 355, at 347.

■ We find abundant basis for jury confusion in this case, both on liability and damages, though on more expansive grounds than those cited by the trial court. The trial court found the jury's Securities Act and tort damage verdicts irreconcilable; we hold that the Securities Act claim should not have been submitted at all. The trial court found the United and Union verdicts irreconcilable; we hold that the United claims should not have been submitted at all. The trial court assumed in its new trial order that separate tort claims were properly submitted for breach of fiduciary duty, auditor negligence, and negligent misrepresentation; we hold that SC/Union was entitled to submit a negligent misrepresentation claim alone. The trial court found, as between United and Union, that only Union could recover its financing costs through its negligence claims; we hold that financing costs were not a recoverable damage element in Union's negligence claim and should not have been submitted at all. The trial court found, and SC acknowledges in its appeal from the new trial order, that the jury's tort awards were based entirely on SC's rescissory damage study; we hold that the rescissory damage study was an improper basis for a tort damage award and, in the

kins addressed the value of United upon resale to Citibank as well as its value upon acquisition, and was specifically asked by SC's attorney why Citibank would have been willing to buy a bank

that was valueless when Union acquired it. PW had the opportunity to cross-examine on this testimony, and its credibility was in the realm of the jury.

absence of a valid Securities Act claim, should not have been submitted at all.

 In part VII of this opinion, we acknowledged SC's argument that PW had waived lack of proof of out-of-pocket damages as a basis for JNOV by failing to move for a directed verdict on that ground. We found it unnecessary to resolve the question of waiver there because, even if PW had made such a motion, SC introduced sufficient evidence to withstand it. We approach the issue differently in evaluating the grant of a new trial. First, evidence sufficient to withstand a motion for directed verdict or JNOV may not suffice to withstand a motion for new trial. In *Landes Construction Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987), the court explained:

> If there is substantial evidence presented at trial to create an issue for the jury, a trial court may not grant a motion for a directed verdict or for [JNOV]. The existence of substantial evidence does not, however, prevent the court from granting a motion for a new trial pursuant to Fed. R.Civ.P. 59 if the verdict is against the clear weight of the evidence.

Second, the rule that issues not objected to at trial are waived is procedural, not jurisdictional, and we may suspend it at our discretion. *See, e.g., City of Tempe v. Fleming*, 168 Ariz. 454, 456, 815 P.2d 1, 3 (App.1991) (recognizing the rule that "arguments not made at the trial court cannot be asserted on appeal" as a procedural rule that the court may suspend at its own discretion) (citations omitted); *Stokes v. Stokes*, 143 Ariz. 590, 592, 694 P.2d 1204, 1206 (App.1984) (same); *see also Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 482, 724 P.2d 562, 568 (1986) (exercising discretion to consider issue argued at trial but not raised on appeal). Third, PW did present its position on out-of-pocket damages at trial. Although PW did not reiterate its position in a motion for directed verdict, PW did request and receive a ruling prior to trial that SC was required to prove out-of-pocket damages on its tort claims. SC, therefore, had notice that out-of-pocket damages were a necessary element of its tort claims, yet chose to rest on an incompatible rescissory damage study alone.

Fourth, PW made timely and appropriate motions with respect to SC's Securities Act claim, and we regard SC's inappropriate submission of a rescissory Securities Act claim and its achievement of a rescissory tort damage award as correlative errors. Through the medium of the damage study, confusion from the rescissory Securities Act claim spilled over into the negligence claims, giving rise to an improper damage award. For all of these reasons, we conclude that we may properly include the inadequacy of SC's damages evidence among the grounds for granting a new trial.

 SC cites authority for the proposition that a reviewing court "must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdicts and remand the case for a new trial." *Toner v. Lederle Lab.*, 828 F.2d 510, 512 (9th Cir.1987), *cert. denied*, 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988). We recognize that obligation. Here, however, we have determined that only Union's negligent misrepresentation claim was properly submitted to the jury. And we cannot find any reasonable way to read the Union negligent misrepresentation verdict that would permit us to affirm that verdict in this appeal.

We cannot sensibly conclude that the jury managed, after nearly a year in trial, to isolate Union's negligent misrepresentation claim from the multiple improperly submitted claims. Nor can we conclude that the jury managed to ignore the rescissory damage study upon which SC premised its entire damage demand. (In the damage study, SC calculated damages of $334,053,768; the jury awarded damages of $334,053,778.) Nor can we conclude that the jury managed instead to base its damage award upon the isolated parts of Perkins' testimony that might have permitted an out-of-pocket damage calculation; the jury was not asked to make such a calculation, and it did not do so.

We conclude, rather, that jury confusion on both liability and damages gave rise to a verdict unsupported by the evidence and contrary to law. We therefore determine that, after entry of JNOV for PW on all the other

claims, this matter must be remanded for new trial on the SC/Union negligent misrepresentation claim alone.

## IX. UNITED'S COMPARATIVE FAULT

Having narrowed this case for the purpose of remand to a negligent misrepresentation claim, we now examine what parties should be included in the apportionment of fault.

On SC's tort claims on behalf of Union, the jury apportioned fault only to PW (85%) and Union (15%). PW contends by cross appeal that a new trial is independently required because the trial court declined to instruct the jury to consider United's relative degree of fault and to give the jury forms of verdict that included United in the apportionment of fault. This argument raises four others: (1) Did PW waive the argument by untimely assertion in the trial court? (2) Is it proper to reduce PW's several liability by allocating fault to United when the fault ascribed to PW is precisely the failure to discover and report United's fault? (3) Did A.R.S. § 12–2506, when this claim arose, permit apportionment of fault in claims for economic damages? (4) Did the fault PW attributes to United cause SC harm?

### A. WAIVER

■ SC argues, and we agree, that PW did not timely present to the trial court the argument it now advances for new trial.

Throughout the trial, PW asserted that its tort liability, if any, should be joint and several with United, and it sought contribution from United for any damages it might owe. In pursuing this contribution claim, PW did seek a jury determination of United's relative degree of fault. The trial court, however, directed a verdict on contribution, which PW did not appeal.

PW also submitted, and the trial court also rejected, the following comparative fault instruction with respect to *United's* damage claim:

> If you decide that United's fault should reduce its damages, you must then determine the relative degrees of fault of all those whom you find to have been at fault.

> The relative degrees of fault are to be entered on the verdict form as percentages of the total fault for United's damage.

This instruction, however, did not seek allocation of United's fault with respect to Union's damage claim.

Not until the morning of final arguments did PW assert the argument it now advances on appeal: that PW's liability to *Union* should be purely several and that PW should be relieved of that portion of Union's damages which is allocable to United's fault. As the court distributed its final packet of jury instructions to counsel, PW objected that the court's forms of verdict did not provide for allocation of United's fault, and PW offered forms of verdict with "three lines for percentages: one for Union, one for United and one for Price Waterhouse." PW also suggested that some of the instructions concerning fault might need correcting, but did not tender any corrections to the court. The jury was assembled and waiting; final arguments were scheduled to begin; the deadline for submitting instructions and forms of verdict had passed. Under these untimely circumstances, the trial court did not abuse its discretion in overruling PW's objection, and PW may not assert the trial court's overruling of its objection as an independent basis for new trial.

This would end discussion of apportionment of fault if we were not affirming a new trial on other grounds. We are affirming a new trial on other grounds, however; and the apportionment issues, which are fully briefed, will surely recur in the second trial. As the first trial was lengthy and costly, we think it best to resolve these issues now before the court and parties undertake a second. Accordingly, we proceed to the merits.

### B. THE AUDITOR'S NEGLIGENT FAILURE TO DETECT THE NEGLIGENCE OF THE CLIENT

■ When the negligence attributed to an auditor is the failure to detect and report its client's financial mismanagement and inaccurate reporting, should the auditor be permitted to reduce its liability by allocating fault to the negligent client? According to SC, the answer to this question should be no,

unless the client hindered the conduct of the audit in some way—a circumstance that is not asserted here.

The leading case for SC's position is *National Surety Corp. v. Lybrand*, 256 A.D. 226, 9 N.Y.S.2d 554, 563 (1939). There, auditors failed to detect the ongoing defalcations of their client's cashier. When sued, the auditors asserted the client's contributory negligence as a defense. The court responded:

> We are ... not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently. The situation in this respect is not unlike that of a workman injured by a dangerous condition which he has been employed to rectify. Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible.... Negligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth.

*Id.* 9 N.Y.S.2d at 563 (citation omitted).

SC urges us to follow *National Surety* in rejecting PW's current argument on appeal, just as the trial court followed *National Surety* in dismissing PW's contribution claim.[19] We find, however, that the rationale of *National Surety* is incompatible with Arizona law. In New York, at the time of *National Surety*, contributory negligence was a complete defense. In Arizona, contributory negligence has never been a complete defense, *see* Ariz. Const. art 18, § 5; and we are now a state of several liability and comparative fault, *see* A.R.S. §§ 12–2501 to – 2506.

SC argues that, even after the adoption of comparative negligence, to allocate fault to the auditor's client would "emasculate[ ] the role of auditors as independent public watchdogs and ... 'render[ ] illusory' an auditor's liability for its own negligence." *See Fullmer v. Wohlfeiler & Beck*, 905 F.2d 1394,

1398–99 (10th Cir.1990). A virtually identical argument was rejected by our supreme court, however, in *Del E. Webb Corp. v. Superior Court*, 151 Ariz. 164, 169, 726 P.2d 580, 585 (1986).

In *Del E. Webb*, a hotel continued to serve liquor to a patron so intoxicated that he ultimately drowned himself in the hotel pool. The survivors filed a wrongful death action before the effective date of Arizona's comparative negligence statute, asserting dram shop liability on the part of the hotel. In a special action they argued that, because the hotel had a duty to discover the intoxication of its patron and take appropriate protective measures, *see Ontiveros v. Borak*, 136 Ariz. 500, 511, 667 P.2d 200, 211 (1983), the hotel should not be permitted to assert the patron's contributory negligence or assumption of risk as a defense. The supreme court responded:

> Many courts holding that the affirmative defenses may not be raised in a dram shop action base their decision on the argument that permitting such defenses would absolutely bar the action in almost every case and therefore make the duty recognized by the cause of action illusory. That argument has much less weight in Arizona after the adoption of comparative negligence.
>
> Of course, the case before us is governed by prior law. However, for reasons peculiar to Arizona the argument was not as compelling even before the effective date of the comparative negligence statute. Under art. 18, § 5 of the Arizona Constitution, contributory negligence and assumption of the risk are always questions of fact for the jury.

*Del E. Webb*, 151 Ariz. at 169, 726 P.2d at 585 (citation omitted). Because contributory negligence under the Arizona constitution was "a form of de facto comparative negligence," *id.*, the supreme court found it unnecessary to abrogate contributory negligence "to prevent the [dram shop] cause of action from becoming illusory." *Id.* at 169–

---

**19.** The trial court also followed *National Surety* in denying PW's request for comparative fault

instructions on SC/United's claims.

70, 726 P.2d at 585–86. "The interests of the public are better served by the common law principles that make most persons responsible for their conduct." *Id.* at 170, 726 P.2d at 586.

Although the supreme court based its decision in *Del E. Webb* upon Arizona's "de facto" constitutional version of comparative fault, the court's reasoning gained force with the statutory adoption of comparative fault, and still greater force with the statutory adoption of purely several liability for tort claims filed after December 31, 1987. *See* 1987 Ariz. Sess. Laws, ch. 1, § 5. The policy of "mak[ing] most persons responsible for their conduct" underlies the requirement of A.R.S. § 12–2506(B) that the factfinder "shall consider the fault of *all* persons who contributed to the alleged injury," (emphasis added) and the requirement of A.R.S. § 12–2506(C) that "[t]he relative degree of fault of the claimant, and the relative degrees of fault of all defendants and nonparties, shall be determined and apportioned as a whole at one time by the trier of fact." In our opinion, the reasoning of *Del E. Webb* applies equally to auditor negligence actions as to dram shop actions. We hold, therefore, that the *National Surety* doctrine does not apply in Arizona, and does not impede the jury's allocation of United's relative degree of fault.

### C. Does A.R.S. § 12–2506 Apply to Economic Damage Claims?

The question remains whether SC's purely economic claim is governed by the statutory mandate to apportion "the fault of all persons who contributed to the alleged injury." *See* A.R.S. § 12–2506(B).

Section 12–2506 applies only to an "action for personal injury, property damage or wrongful death." A.R.S. § 12–2506(A); *see also* A.R.S. § 12–2501(A). In 1993, the legislature added A.R.S. § 12–2501(G):

> As used in this article, "property damage" means both physical damage to tangible property *and economic loss proximately caused by a breach of duty.*

(Emphasis added.) The legislature limited this amendment to prospective application in cases filed from and after November 21, 1991. 1993 Ariz. Sess. Laws ch. 203, §§ 1, 4.

SC infers from the prospective adoption of A.R.S. § 12–2501(G) that, in earlier cases, the legislature intended "property damage" to mean only "physical damage to tangible property" and not "economic loss." Elsewhere in the same enactment, however, the legislature provided:

> The legislature intends that this act shall not give rise to any inference, or be asserted as creating any implication, one way or another, as to the proper interpretation, prior to November 21, 1991, of the sections amended by this act.

*Id.* § 3B. Thus, the legislature deliberately left ambiguous whether "property damage" included "economic loss" in cases that preceded the adoption of A.R.S. § 12–2501(G).

SC argues that we may resolve this question by limiting "property damage" before the amendment to its typical usage in tort law. In tort law, SC argues, "property damage" is a term of art that denotes only damage to tangible property and excludes purely economic claims. *See, e.g., United States Fidelity & Guar. Corp. v. Advance Roofing & Supply Co.*, 163 Ariz. 476, 480, 788 P.2d 1227, 1231 (App.1989) ("property damage" defined in insurance policy as "physical injury to or destruction of tangible property"). SC cites the Uniform Comparative Fault Act of 1977, which, by reference to "injury or death to person or harm to property," was intended to exclude claims for purely economic loss. *See* Unif. Comparative Fault Act § 1(a) & cmt., 12 U.L.A. 45 (1995 Supp.). SC calls for a similarly restrictive interpretation here.

■■ Once again, however, the legislature engendered ambiguity on this point. If the legislature had accepted "property damage" as a restricted term of art, it could readily have added economic loss claims to A.R.S. § 12–2501 *et seq.* as a covered category separate and distinct from property damage claims. Instead, the legislature treated "property damage" as a term sufficiently flexible to include "both physical damage to tangible property and economic loss." A.R.S. § 12–2501(G).

When the text of a statute is capable of more than one construction or result, legis-

lative intent on the specific issue is unascertainable, and more than one interpretation is plausible, we ordinarily interpret the statute in such a way as to achieve the general legislative goals that can be adduced from the body of legislation in question.

*Dietz v. General Elec. Co.*, 169 Ariz. 505, 510, 821 P.2d 166, 171 (1991). We approach this issue in that way.

■ The legislative goal to be adduced from A.R.S. § 12–2506 is plainly stated in the statute itself: "Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault...." A.R.S. § 12–2506(A). The supreme court summarized the statutory purpose in *Dietz* as to "mak[e] each tortfeasor responsible for paying for his or her percentage of fault *and no more.*" 169 Ariz. at 510, 821 P.2d at 171. This goal would be impeded by excluding, and advanced by including, economic claims within the ambit of the statute. We therefore interpret the statute as including economic claims before the 1993 addition of A.R.S. § 12–2501(G).

### D. CAUSATION

■ SC finally argues that, even if we reject *National Surety,* and even if we conclude that A.R.S. § 12–2506 applies, we still should not permit PW to reduce its liability and SC's recovery in this case by reference to United's fault. It was PW's conduct, not

United's, according to SC, that *caused* Union harm. SC continues:

> [SC] sought damages on behalf of Union not because United Bank was worth less than what Union paid, but because PW induced Union to buy United Bank *at all.*
>
> . . .
>
> . . . .
>
> In other words, what damaged Union was not United['s] poor financial condition, but Union's justifiable reliance on PW-provided information about United ... that *failed to disclose* its true financial condition.

We find this argument unpersuasive. SC in effect argues for a directed verdict that United's conduct did not contribute to Union's harm. We conclude instead that the parties' relative contribution to causation is best left for the jury to determine as an element in apportioning relative degrees of fault.

In summary, for the reasons stated in this section, we hold that upon remand the court must permit apportionment to United of its relative degree of fault.[20]

### X. EVIDENTIARY ISSUES

Our resolution makes it unnecessary to address all of the issues that the parties have raised. Because SC's negligent misrepresentation claim must be retried, however, we address certain evidentiary issues that are likely to recur.[21]

---

20. Our decision in this section is not inconsistent with our decision in part V. There we considered the evidence that United's stockholders received more than their stock was worth in Union's acquisition of United, and we concluded that the trial court should have entered JNOV on the claims of SC/United because SC did not prove any *damage* to United. Here we decide that the trial court must permit allocation of *fault* to United, which was a separate entity from Union at the time of the acts that allegedly contributed to Union's harm.

21. One issue that we need not resolve is whether SC's counsel engaged in reversible misconduct by referring in summation to PW's wealth and asserting, with negligible foundation in the evidence, that PW earned $2.6 billion in revenues from the services of its worldwide accounting staff. SC attempts to justify its wealth-related arguments only in reference to SC's racketeering

claim. *See* A.R.S. § 13–2301(D)(4) (Supp.1995). The jury, however, returned a verdict in PW's favor on that claim, from which SC has not appealed.

SC does allude to the racketeering claim at the very end of its appeal from the trial court's grant of a new trial. After arguing that any retrial of the securities claim should be limited to the amount of damages, SC states, without citation or elaboration, "Alternatively, the Court should require retrial of the racketeering claim as well." SC attributes no error to the racketeering verdict, however, and its unadorned alternative request for retrial of that claim does not suffice to raise an issue on appeal. *See* Ariz. R. Civ.App. P. 13(a)(6) (establishing necessary elements of an argument on appeal); *see also AMERCO v. Shoen,* 184 Ariz. 150, 154 n. 4, 907 P.2d 536, 540 n. 4 (App.1995) (cursory assertion without argument or authority insufficient to preserve issue for appeal).

## A. Exclusion of Binkly Testimony About Union's § 338 Filing

The 1986 financial statement for United, audited by PW, reflected a loan loss reserve of $23 million. Union took the position at trial that this figure grossly understated the amount of United's doubtful or uncollectible loans.

In October 1988, though, in a tax document Union filed under § 338 of the Internal Revenue Code, Union reported United's loan loss reserve at $9.8 million as of the January 8, 1987, acquisition date. PW sought to have its audit expert, John Binkly, infer from the § 338 filing that Union, having subsequently evaluated the loan loss reserve at $9.8 million, could not have regarded $23 million as an understated valuation. The trial court declined to allow Binkly's testimony. PW assigns error to this ruling.

SC argues that the trial court did not abuse its discretion in preventing Binkly's testimony. It relies upon evidence indicating that the § 338 loan loss valuation was calculated according to a statutory formula unrelated to estimating the actual value of doubtful and uncollectible loans. The trial court therefore had discretion, according to SC, to reject Binkly's opinion as insufficiently trustworthy to assist the jury in understanding the evidence.

■ We, however, agree with PW that the reasonableness of Binkly's opinion, and the weight to be assigned to it, were for the jury to gauge.

■ Rule 702, Arizona Rules of Evidence, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

To be admissible, an expert's opinion may rely upon facts and data from three types of sources: "(1) facts admitted into evidence at

trial, (2) facts personally perceived by the expert, [or] (3) facts of a type reasonably relied upon by experts in the particular field." *Lynn v. Helitec Corp.*, 144 Ariz. 564, 568, 698 P.2d 1283, 1287 (App.1984); *see also* Ariz. R. Evid. 703.

■ In *Lynn* we also stated:

The test for admissibility of an expert's opinion based on facts not in evidence, is whether the source relied upon by the expert is reliable. The trial court is accorded wide discretion in such determinations.

. . . .

. . . The test is whether the source of the expert's opinion meets the two critical factors of necessity and trustworthiness. Trustworthiness comes from external indicia of reliability, such as a routine and customary business record or preparation of a report by a disinterested, expert third party.

144 Ariz. at 568, 698 P.2d at 1287 (citations omitted).

Although the trial court concluded that Binkly had relied on information of a type that auditors would reasonably rely upon, the court found Binkly's opinion foundationally defective. Specifically, after questioning Binkly itself, the trial court concluded that he did not know how Union had calculated the § 338 loan loss valuation in fact.

Q. And you don't know whether or not [they] in fact did that, but that's what should have been done?

A. That's what should have been done, and I accepted it for face value. They published financial statements, filed them with the Securities Exchange Commission, filed the tax returns signed under penalties of perjury, Peat Marwick documented a conversation. I took that for face value. I thought that was reasonable.

Because Binkly based his opinion on what Union should have done, and not upon what it actually did, the court found inadmissible Binkly's conclusion that the § 338 filing rep-

---

Because the racketeering claim may not recur on remand, there is no remaining justification for reference to PW's revenues or wealth. Ac-

cordingly, we need not address either the propriety of counsel's argument or whether it provided an additional basis for new trial.

resented Union's own evaluation of its loan loss reserves. We disagree.

Binkly testified that the applicable tax regulations required that the § 338 loan loss valuation be calculated as an estimate of the fair market value of the loan portfolio. Union filed and signed a tax return representing to the United States government, under penalty of law, that the fair market value of the discount on the loan portfolio was $9.8 million. That filing suggests the information's trustworthiness. *See Lynn,* 144 Ariz. at 568, 698 P.2d at 1287. Under these circumstances, it was permissible for an expert to conclude that the § 338 filing was in fact based upon Union's calculation of the loan portfolio's fair market value.

■■. That SC had evidence to the contrary merely goes to the weight and credibility of Binkly's opinion. "The weight and credibility to be given expert testimony are matters to be decided by the factfinder." *State v. Moyer,* 151 Ariz. 253, 255, 727 P.2d 31, 33 (App.1986); *see also State v. Lajeunesse,* 27 Ariz.App. 363, 368, 555 P.2d 120, 125 (1976) (weight to be given expert's opinion was for jury to determine). Binkly's opinion should therefore have been heard by the jury.

Moreover, permitting the introduction of Binkly's opinion would not have been unfairly prejudicial to SC. The same arguments and evidence used to attack Binkly's opinion testimony before the trial court would have been available to SC in its cross-examination and summation.

> [O]nce an expert offers his opinions he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based and which he took into consideration and may be subjected to the most rigid cross-examination concerning his qualifications and his opinion and its sources.

*State v. Swafford,* 21 Ariz.App. 474, 486, 520 P.2d 1151, 1163 (1974); *see also State v. Stabler,* 162 Ariz. 370, 374, 783 P.2d 816, 820 (App.1989); Rule 705, Arizona Rules of Evidence.

Accordingly, we conclude that the trial court erred by disallowing Binkly's opinion testimony. On retrial, the weight and credibility of Binkly's opinion should be matters reserved for the jury.

### B. BINKLY AS PW'S $2 MILLION MAN/MILLIONS FOR DEFENSE

■■ PW protests SC's counsel's references during closing argument to PW expert John Binkly as the "$2 million man." PW also protests SC's repeated references to the millions that PW was willing to spend in defending the action.

PW does not deny that it paid Binkly's firm approximately $2 million for its work on the case, and that Binkly was a partner in that firm. Binkly's financial interest in the litigation was properly explored as evidence of bias. *See* M. UDALL ET AL., ARIZONA PRACTICE LAW OF EVIDENCE § 45 (3d ed.1991). The fact that the fee was paid to Binkly's firm rather than to Binkly personally was in the record and could have been pointed out in PW's summation.

Although PW received little testimonial benefit from Binkly's firm's work because PW failed to timely disclose the results to SC, Binkly's firm nevertheless received the fee. SC's counsel's references to Binkly as the "$2 million man" and to PW's spending millions on litigation were not improper under the circumstances that prevailed at this trial.[22]

### C. EXCLUSION OF 1988 O'BRIEN MEMORANDUM

■■ PW sought to introduce a memorandum dated December 22, 1988, authored by Timothy O'Brien, of Union's accounting firm Peat Marwick. In the memorandum, O'Brien attributed statements to Union's chief financial officer and corporate tax man-

---

**22.** PW also argues that SC misstated the record in arguing that Binkly had failed to make a necessary comparison of PW working papers and United source documents. We need not address this argument, as PW may present different evidence on remand.

ager to the effect that the $9.8 million tax bad debt reserve reflected a more appropriate valuation of the credit risk in the United loan portfolio at the time of acquisition than the $23 million estimate in United's audited financial statement. (This evidence, if admitted, would have favored PW, as it would have tended to disprove SC's contention that the $23 million reserve was grossly *understated.*) The trial court excluded the memorandum itself as hearsay, but allowed PW to present O'Brien's deposition testimony, during which he discussed his recollection of the memorandum's contents.

PW contends it was error to exclude the memorandum. It argues that the memorandum should have been admitted as a business record under Rule 803(6), Arizona Rules of Evidence.[23]

The trial court found the memorandum inadmissible under the business records exception because it was not made at or near the time of the events it records. The trial judge reasonably exercised his discretion in drawing this conclusion. Although PW argues on appeal that O'Brien placed his conversations with Union's chief financial officer and corporate tax manager in the summer or fall of 1988—close enough to qualify as "at or near" the memorandum date of December 22, 1988—SC cites evidence in O'Brien's deposition that permits the conclusion that the conversations occurred as early as May. Further, although PW describes O'Brien as testifying that he prepared the memorandum *when his recollection was still clear,* he actually testified as follows:

> Q. BY MR. GUY: Did you prepare this memorandum at a time when you did in fact recall the substance of those meetings with Mr. Frazee and Mr. White?

> A. When I prepared this memorandum, to the best of my knowledge, *at that point in time it was not a matter of recollection.* If you'd like to rephrase the question. I'm not sure what you're asking.

> Q. At the time you prepared the memorandum, you did have a *recollection* of the substance of the meetings in question; is that correct?

> A. I had an *understanding* of the substance of the meetings and *was aware of it,* yes.

(Emphasis added.)

The trial court did not abuse its discretion in excluding the O'Brien memorandum from evidence, while permitting introduction of his deposition testimony concerning its substance.

### D. EXCLUSION OF "POTENTIAL MEDIA QUESTIONS AND RESPONSES" DOCUMENT

SC produced an undated three-page document entitled "Potential Media Questions & Responses" from the files of Union's in-house legal counsel in response to a motion to produce from PW and an order from the Discovery Master. The document was listed on Union's "Privilege Log" and had a handwritten notation on the top of it directed to CDK, presumably Charles Kenny, Union's in-house counsel. The author of the document is unknown.

SC objected to the admission of the document based on lack of foundation. The trial court sustained the foundational objection because PW did not show who prepared the document or "whether it was adopted by anyone at Stand[ard] Chartered, Union, or any of the other plaintiffs in this case." Be-

---

23. Rule 803(6) provides in part:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 . . . .
 **(6) Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if:
 (a) Made at or near the time of the underlying event,
 (b) by, or from information transmitted by, a person with first hand knowledge acquired in the course of a regularly conducted business activity,
 (c) made and kept entirely in the course of that regularly conducted business activity,
 (d) pursuant to a regular practice of that business activity; and
 (e) all the above are shown by the testimony of the custodian or other qualified witness.
 However, such evidence shall not be admissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness or to the extent that portions thereof lack an appropriate foundation.

cause PW was not able to establish that the document fell within the definition of an admission by a party-opponent, *see* Ariz. R. Evid. 801(d)(2), or within a hearsay exception, *see* Ariz. R. Evid. 803, the court correctly sustained SC's objection to foundation. The court then denied PW's request to take a five-minute deposition of Union's in-house counsel in order to meet the foundational objection.

The trial court's ruling denying the request to reopen deposition testimony to obtain additional foundational material was made after ten months of trial. Because our ruling on other issues will require a new trial, our review of this issue assumes that the time constraints faced by the court and counsel at the time of the prior ruling no longer exist. The denial of PW's request to depose Union's in-house counsel, although proper under the circumstances that existed at the time, is no longer warranted. We leave to the trial court, on remand, the ultimate decision as to the foundation and the admissibility of the document.

## E. "TITANIC" VIDEOTAPE

The trial court allowed SC to play, during its closing argument, a videotape comparing the auditing conduct of PW in the instant case to the conduct of the captain of the Titanic, interspersing portions of a Hollywood production of the Titanic disaster. Both a written transcript of the narration on the Titanic video and a copy of the videotape itself have been made available for this court's review.

The trial judge screened the Titanic video before closing argument and found that it was not inflammatory and was appropriate for closing argument. On appeal, PW characterizes the Titanic video as a calculated attempt to inflame the jurors. It also argues that the videotape misstated certain evidence presented at trial. PW relies primarily on *Bledsoe v. Salt River Valley Water Users' Association*, 179 Ariz. 469, 880 P.2d 689 (App.1994).

As SC points out, PW did not object to the showing of the Titanic video when it was played for the jury. After closing arguments, PW objected as follows:

[Counsel for PW]: Well, Your Honor, it was just clearly improper, inflammatory, argumentative. I know the court's screened it. We had no opportunity to see it before it was shown to point out the things about it that were improper.

Perhaps the worst point about it, your Honor, is, hey, we've researched it and whoever in Hollywood did it had their facts all wrong on what happened the night the Titanic sank. But that's Hollywood.

But the worst thing, Your Honor, is— you can't justify it as argument by analogy, saying this is like something else. What they did was, they said, the—the facts of the Titanic match the facts of this case.

And there's nothing in the record. I mean, it's just classic. You can argue inferences from facts in the record. There's no facts in the record about the Titanic. And, certainly, the facts that they put in the record came from Hollywood and not from any evidence heard in this courtroom.

THE COURT: All right. Well, the objection will be overruled. I won't instruct the jury regarding the tape.

■ PW contends that the video was improper, inflammatory, argumentative, and based on nonexistent or inaccurate evidence about the sinking of the Titanic. We agree.

In *Bledsoe*, a videotaped computer simulation ("VCS") of the accident at issue was shown to the jury during closing argument. Division Two reversed and remanded for a new trial, rejecting the plaintiff's argument that the simulation was effectively the same as a chart or diagram that counsel might draw during closing argument. The court stated:

Having viewed the VCS ourselves, we conclude that it is not a pedagogical device. The VCS depicts a computer expert's opinion of, among other things, how the accident happened, the location of lighted and darkened areas at the time, and the effect of alternate or additional lighting. Bledsoe was thus required to lay the appropriate foundation for those opinions, and SRP was entitled to cross-examine the expert about them. Without requiring such foundation and permitting the opportunity for

cross-examination, the trial court erroneously "admitted" the VCS under the guise of closing argument.

179 Ariz. at 472, 880 P.2d at 692 (citations omitted). In contrast, no one could mistake the Titanic video shown by SC for a scientific or literal representation of what actually occurred in the case before the jury. This characteristic, however, does not make the use of this video more acceptable than the use of the video in *Bledsoe*.

SC's video combined high-technology visual images with the voice of an unseen narrator. The video used graphic representations from a Hollywood version of an event wholly unrelated to the events that the trial concerned. The video also included figurative visual representations of events about which testimony had been received—for instance, a scene in which a stack of papers, each labeled "LOAN," was serially initialled at a rapid rate. The video had the flavor of a televised, negative political advertisement on the eve of a hotly contested election.

■ The function of closing arguments is to enable each party to review the evidence and tie it to the applicable law in a light that favors its legal position at the trial. Demonstrations before the jury should not be used to divert the jury from the evidence but to help the jury understand it. *See People v. Dowds*, 253 Ill.App.3d 955, 192 Ill.Dec. 723, 724, 625 N.E.2d 878, 879 (1993); *People v. Harp*, 193 Ill.App.3d 838, 141 Ill.Dec. 117, 120, 550 N.E.2d 1163, 1166 (1990), *appeal denied*, 132 Ill.2d 550, 144 Ill.Dec. 261, 555 N.E.2d 380 (1990). During summation counsel may state matters not in evidence, but only those which are common knowledge or are illustrations drawn from common experience, history, or literature. *People v. Wharton*, 53 Cal.3d 522, 280 Cal. Rptr. 631, 658, 809 P.2d 290, 317 (1991), *cert. denied*, 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992); *People v. Love*, 56 Cal.2d 720, 16 Cal.Rptr. 777, 782, 366 P.2d 33, 38 (1961), *overruled on other grounds by People v. Morse*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964). As the court stated in *People v. Thompson*, 161 A.D.2d 236, 555 N.Y.S.2d 266 (1990):

[S]ummation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits.... Above all [counsel] should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant.

*Id.* 555 N.Y.S.2d at 268 (quoting *People v. Ashwal*, 39 N.Y.2d 105, 383 N.Y.S.2d 204, 206–07, 347 N.E.2d 564, 566–67 (1976)).

A non-evidentiary videotape such as SC's Titanic video has substantial potential for such abuse. We see little difference between the use of videotaped Hollywood disaster footage to suggest the impact of a tort and the use of mood music, animated cartoons, or professional actors, costumes, and dramatic props.

Neither counsel has identified a case in which the propriety of a non-evidentiary videotape like SC's has been resolved. We resolve against such usage here. In our view, the videotape was designed to inflame the jurors' emotions, not assist their minds. The enterprise that we engage in is not show business. Upon remand, the Titanic tape may not be used.

## XI. CONCLUSION

For the reasons set forth above, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.